HERMAN JONES LLP
SERINA M. VASH
153 Central Avenue #131
Westfield, New Jersey 07090
Telephone: (404) 504-6516
Facsimile: (404) 504-6501
svash@hermanjones.com

[Additional Counsel Appear on Signature Page]

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE BAUSCH HEALTH COMPANIES INC. F/K/A VALEANT PHARMACEUTICALS INTERNATIONAL, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) ) |
| | ) ) ) ) |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS. | ) ) ) ) ) ) ) |
| | ) |

Lead Case No. 3:19-cv-17833-MAS-LHG

(Consolidated with Case No. 3:19-cv-17987-MAS-LHG)

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION AND INDEMNIFICATION

DEMAND FOR JURY TRIAL

Plaintiffs David Shabbouei ("Plaintiff Shabbouei"), located at 474 Arbramar Avenue, Pacific Palisades, California, and William Wessels ("Plaintiff Wessels"), located at 745 County Road 106, Purmela, Texas, by their attorneys, submit this Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution and Indemnification.  Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs which are based on personal knowledge.  This consolidated complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Bausch Health Companies Inc. formerly known as Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment, contribution and indemnification, and violations of law.  These wrongs resulted in billions of dollars in damages to Valeant's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Valeant to billions of dollars in potential liability for violations of law.

2.     Valeant develops, manufacturers, and markets a range of branded and generic pharmaceuticals, over-the-counter products, and medical devices.   In February 2008, defendant J. Michael Pearson ("Pearson") became Valeant's Chief Executive Officer ("CEO"). Under defendant Pearson's leadership, Valeant engaged in an aggressive "roll-up" strategy, which consisted of growing revenues through acquisitions and cutting spending on research and development ("R&D").  Between 2008 and 2016, Valeant acquired over 100 companies for over $36 billion in total, making Valeant one of the largest acquirers in any industry over the past decade.

3.     From 2012 through 2015, the Company's growth-by-acquisition strategy appeared to be working.  During this time Valeant's stock price soared nearly 350% from just under $60 on December 31, 2012, to a high of $262 on August 5, 2015.  At its peak in July of 2015, Valeant had a valuation of over $90 billion, and was one of the largest pharmaceutical companies traded on the New York Stock Exchange.

4.     In order to finance its acquisitions and assuage concerns about Valeant's nontraditional business strategy and increasing levels of debt financing, the Company sought to convince investors of the long-term value of its strategy. Valeant's executives routinely touted the Company's "strong organic growth," which it attributed to its "innovative" marketing strategies, increased sales volume, and superior leadership.  Defendant Pearson repeatedly assured investors and analysts

that Valeant's business strategy was "sustainable."  To unsuspecting investors and the broader market, Valeant appeared immune to the limitations on growth encountered by other companies in the industry.

5.    Unfortunately, however, this was not the case.  Rather, Valeant was able to sustain year-on-year revenue growth (and maintain its artificially inflated stock price) only through unsustainable and deceptive practices that exposed the Company to substantial undisclosed risks, including lost sales, regulatory sanctions, and reputational harm.  One deceptive practice Valeant implemented was price gouging.  Valeant strategically acquired products that had little or no generic competition and subsequently increased prices far beyond industry norms.  For instance, after acquiring Cuprimine®, a drug used to treat Wilson's disease, in 2010 from Aton Pharma, Inc. ("Aton"), Valeant increased the price of the drug *2,849%* between February 2013 and the first quarter of 2015, even though the drug had been on the market since the mid-1950s.  Similarly, after acquiring Syprine® from Aton, another drug used to treat Wilson's disease, Valeant increased the price of the drug by *1424%* between the first quarter of 2013 and the third quarter of 2015.  In 2015 alone, Valeant raised prices on its branded drugs an average of *66%*, according to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis—approximately *five times* as much as its closest industry peers.

6.     To facilitate its price gouging strategy, Valeant created a clandestine network of controlled "specialty pharmacies."   Philidor Rx Services, LLC ("Philidor"), a seemingly independent Pennsylvania mail-order pharmacy, was the most prominent of these captive pharmacies and the hub of Valeant's network. Through Philidor, Valeant created a host of shell companies which it then used to acquire interests in additional retail pharmacies all over the United States.

7.     With their secret pharmacy network in place, defendants channeled prescriptions for Valeant's branded drugs—particularly those that were especially susceptible to generic competition, like the Company's dermatological products— through Philidor.   Philidor employees, as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of unconventional, deceptive, and unlawful practices to reduce barriers to sales of, and reimbursements for, Valeant's pharmaceuticals despite massive price hikes.   These practices included: (i) blocking the substitution of cheaper and medically equivalent generic alternatives by physically altering, modifying, and falsifying physician prescriptions to require that Valeant products be dispensed as opposed to low-cost generic alternatives; (ii) automatically refilling patient's prescriptions without the patient's or physician's request and for no medically justified reason; (iii) changing the identity of the dispensing pharmacies to avoid denials of claims for Valeant-branded drugs; (iv) manipulating Patient Assistance Programs ("PAPs") by secretly waiving

patient copays for Valeant drugs to minimize patient's incentive to seek cheaper generic substitutes; and (v) using pharmacies in its captive network to enable Philidor to indirectly operate in states where it had been denied a license. Through these practices, Valeant was able to charge supracompetitive prices for Valeant-branded pharmaceuticals and sell Valeant-branded drugs that would otherwise never have been purchased.

8.     The Company's deceitful conduct was front and center when Valeant attempted a hostile acquisition of drug manufacturer Allergan, Inc. ("Allergan") in February 2014. Allergan rebuffed the offer, arguing that Valeant's business model was unsustainable and reliant on some "eye-popping price increases." Nonetheless, Valeant persisted, making several more unwelcome bids for Allergan while repeatedly assuring investors and analysts that Allergan's claims were unfounded. For instance, on May 28, 2014, defendant Pearson told investors that "the highest price increase [Valeant] could take under any managed care contract … in the US is 9% a year." Defendant Pearson thus reasoned, "we have a lot of constraints, just like other pharma companies do, in terms of pricing." On June 17, 2014, defendant Pearson further assured investors that Valeant's operating model is "both durable and sustainable," and boasted that Valeant's key products were "growing by volume, not just price."

9.     Valeant's unlawful practices began trickling out in late September 2015, as a result of government investigations, a lawsuit by R&O Pharmacy, LLC ("R&O"), a pharmacy whose National Provider Identifier ("NPI") number Philidor had used without permission to obtain payments from insurers for Valeant pharmaceuticals, and the revelation by investigative journalists of Valeant's secret relationship with Philidor.  Despite these partial revelations, defendants continued to distort and conceal Valeant's deceptive business practices.  For example, after the U.S. Congress and investigative journalists began to uncover the astronomical prices Valeant was charging for its pharmaceuticals, defendants reassured investors and the market that the Company was focused on "volume growth," rather than price increases, when in fact 80% of Valeant's growth had been achieved through increasing prices and only 20% through increasing volume.  Further, when Valeant's secret relationship with Philidor came to light in October 2015, defendants represented that Philidor wasn't critical to Valeant, despite the fact that roughly 55% of Valeant's year-over-year growth was due to Philidor.  In addition, when reporters suggested that Valeant could be using Philidor to artificially inflate its reported revenues, defendants reassured investors that Valeant's accounting practices were appropriate, when in reality the Company was improperly accelerating the recognition of revenue and double counting revenue on its transactions with Philidor.

10.     On October 27, 2015, hedge fund billionaire William A. Ackman

("Ackman") and one of Valeant's largest stockholders at the time, sent an e-mail to defendant Pearson, defendant Howard B. Schiller ("Schiller"), Valeant's then Chief Financial Officer ("CFO"), and other Valeant Board of Directors (the "Board") members concerning a *New York Times* article by Joe Nocera that described Valeant as "sleazy" and questioned whether Valeant was the "Next Enron."  In his e-mail, Ackman noted that, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short," and criticized defendant Pearson's abrupt end to an earlier conference call and his scripted answers, stating: "The only people that need scripts and limited questions are crooks.  Joe Nocera is right.  You look like Enron."  Ackman warned that "Your reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis," and advised them to hold a conference call to answer questions "honestly no matter how embarrassing the answers are and no matter what the legal implications are." Ackman further advised that "the truth will come out eventually" and to "do the right thing."

11.     While defendant Pearson did not follow Ackman's advice, the truth nevertheless continued to emerge.  On October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim—to

essentially shop around for one that would be accepted." The following day, the three major pharmaceutical benefit managers ("PBMs")[1] in the U.S. (Express Scripts, CVS Caremark, and OptumRx) announced that they would no longer reimburse prescriptions from Philidor.  Almost immediately thereafter, Valeant announced it would be terminating its relationship with Philidor and that Philidor would be shutting down as soon as possible.  Although Valeant had vigorously defended Philidor only days before, defendant Pearson stated that Valeant had "lost confidence in Philidor's ability to continue to operate in a manner that is acceptable."

12.    Valeant has since withdrawn its financial statements and acknowledged them to be false, restated its fiscal year 2014 revenues, slashed its revenue and profitability guidance for 2015 and 2016, and admitted the inadequacy of the Company's disclosure controls and internal controls over financial reporting.  On February 3, 2016, Valeant issued a press release admitting that Valeant had not grown more by volume than price in first quarter 2015, as defendant Pearson had previously stated in April 2015.  On February 22, 2016, Valeant issued a press release confirming the falsity of its previously reported financial statements for 2014

---

[1] A PBM administers prescription drug benefits on behalf of employers, labor unions, and other entities that provide those benefits as part of their health insurance plans.  PBMs also negotiate the prices that end-payors pay to drug manufacturers, which are then sold through retail or specialty pharmacies that also have contracts with PBMs.

and the first three quarters of 2015 due to Valeant's improper accounting for transactions with Philidor.

13.     The substantial financial impact of Valeant's inability to continue its deceptive practices was further revealed on March 15, 2016, when the Company announced its unexpectedly dismal unaudited fourth quarter 2015 financial results and slashed guidance for fiscal year 2016. In the press release, Valeant also admitted that it had inadequate internal controls and disclosure controls and that it could not release audited financial statements until the Board completed an assessment of the Company's internal controls.  On this news, the price of Valeant stock plummeted by more than 50%, from a close of $69.04 per share on March 14, 2016, to a close of $33.51 per share on March 15, 2016, on extremely high trading volume.

14.     On March 21, 2016, Valeant issued a press release announcing the restatement of its prior financial statements.  The Company disclosed that it had been improperly recognizing revenue on transactions with Philidor and "approximately $58 million in net revenue relating to sales to Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor."  As a result, Valeant's Annual Report on Form 10-K for the fiscal year ended 2014 and each of the Company's Quarterly Reports on Forms 10-Q for the fiscal year of 2015, could no longer be relied upon.  The press release stated that "one or more material weaknesses exist in the company's internal control over financial reporting," as a

result, "internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015."

15.     In the press release, Valeant attributed its fictitious accounting to the "improper conduct" of defendants Schiller and Tanya Carro ("Carro"), the Company's former Corporate Controller, as well as the unethical "tone at the top" set by senior management.  These Valeant executives, along with defendant Deborah Jorn ("Jorn"), Valeant's former Executive Vice President and Company Group Chairman, who led the dermatology division (representing a large portion of Philidor sales), and the majority of the Board's Audit and Risk Committee, all left Valeant in the wake of these disclosures.

16.     The illegal and deceptive practices detailed herein have devastated the Company.  Since the truth about Valeant's business practices began slowly emerging in the third quarter of 2015, Valeant's stock has plummeted more than 90%, from a high of $262 per share on August 5, 2015, to less than $25 per share on June 7, 2016. In total, Valeant's stockholders have suffered over $80 billion in market capitalization losses.  Valeant's wrongdoing was so pervasive and the resulting losses so severe that commentators dubbed it the "Pharmaceutical Enron."

17.     Further, the wrongdoing detailed herein subjected the Company to a number of governmental investigations, including by the SEC, the State of Texas, the State of North Carolina, and both houses of Congress, as well as a criminal probe by the U.S. Department of Justice ("DOJ").  In November and December of 2016, Gary Tanner ("Tanner"), a former senior executive at Valeant, and Andrew Davenport ("A. Davenport"), the former CEO of Philidor, were arrested on four counts of fraud and conspiracy in connection with the scheme to fraudulently peddle Valeant pharmaceuticals.  On January 27, 2017, they were named as defendants in an indictment filed in the U.S. District Court for the Southern District of New York, subsequently convicted on all four counts against them, including wire fraud and conspiracy to commit money laundering, and sentenced to one year in prison.

18.     As a result of the pervasive misconduct alleged herein, the Company is also the subject of a number of lawsuits in the U.S. and Canada.  On April 28, 2017, the Honorable Michael A. Shipp denied, in part, Valeant's motion to dismiss in a consolidated securities class action lawsuit pending in the U.S. District Court for the District of New Jersey on behalf of investors who purchased Valeant's shares or acquired Valeant stock pursuant to or traceable to misleading offering documents issued in connection with certain of the Company's debt and equity offerings (the

"Securities Class Action").[2]   Additionally, over thirty-one groups of individual investors have chosen to opt out of the consolidated action and filed securities actions in the U.S. District Court for the District of New Jersey.  On July 31, 2018, the Honorable Michael A. Shipp denied, in part, Valeant's motions to dismiss in three separate lawsuits alleging Valeant inflated its stock price through unsavory and deceptive business practices.[3]   In doing so, Judge Shipp found that the investors adequately pled that Valeant and its executives engaged in a pattern of racketeering activity by using its clandestine pharmacy network and inaccurate financial statements to defraud investors.[4]   As a result of the numerous governmental investigations, lawsuits, and substantial losses suffered by investors, the Company faces billions of dollars in liability.

---

[2] *See In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 1658822 (D.N.J. Apr. 28, 2017).

[3] The cases are *Lord Abbett Investment Trust, et al. v. Valeant Pharmaceuticals International Inc., et al.*, No. 3:17-cv-06365 (D.N.J.); *The Boeing Company Employee Retirement Plans Master Trust, et al. v. Valeant Pharmaceuticals International Inc., et al.*, No. 3:17-cv-07636 (D.N.J.); and *Public Employees' Retirement System of Mississippi v. Valeant Pharmaceuticals International Inc., et al.*, No. 3:17-cv-07625 (D.N.J.).

[4] Additionally, the Company is the subject of a class action lawsuit filed on behalf of third-party payors who paid claims or incurred costs in connection with Valeant prescriptions from January 2, 2013 through November 9, 2015.

19.     While the wrongdoing detailed herein has devastated Valeant's credibility and caused the Company substantial damages, defendants did not fare nearly as poorly.  Defendant Jeffrey W. Ubben ("Ubben") unlawfully reaped over $925 million in illegal insider trading proceeds of Company stock.  On June 30, 2019, Judge Shipp denied defendant Ubben's motion to dismiss claims in the Securities Class Action that he and his company, ValueAct Capital Management, L.P. ("ValueAct"), illegally dumped $925 million worth of Valeant stock ahead of revelations about the Company's deceptive sales practices.  In doing so, Judge Shipp found that the timing and scope of the sales was suspicious because ValueAct only purchased—rather than sold—Valeant stock in the two years before June 2015, when Valeant stock traded at or near all-time highs.

20.     On June 5, 2018, plaintiffs' counsel sent a litigation demand to the Valeant Board on behalf of Plaintiff Shabbouei, demanding that the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging Valeant, including certain of the Company's current and former officers and directors (the "Shabbouei Demand").  In a letter dated July 9, 2018, counsel for a claimed special committee of the Board (the "Special Committee") informed plaintiffs' counsel of the Special Committee's formation and that it would be considering the Shabbouei Demand.  On July 30, 2018, plaintiffs' counsel sent a substantially similar litigation

demand to the Board on behalf of another Valeant stockholder, Plaintiff Wessels (the "Wessels Demand," and together with the Shabbouei Demand, the "Demands").

21.     At least four months after plaintiffs first sent their Demands, counsel for the Special Committee notified plaintiffs' counsel by telephone that the Board had rejected the Demands.   While plaintiffs sought documents concerning the Board's decision to reject the Demands and entered into an appropriate confidentiality agreement, Valeant's counsel refused to provide a single document evidencing how the Board or Special Committee reached its conclusion.  In fact, Valeant did not even provide any documentary evidence that the Board had rejected the Demands.  By failing to provide any documents underlying the Board's decision to refuse the Demands, the Individual Defendants (as defined herein) are attempting to insulate the Special Committee's investigation and the Board's decision to refuse the Demands from any scrutiny.

22.     In light of the Board's improper refusal to act, plaintiffs bring this action to remedy the harm caused by defendants' wrongful actions.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78u-4).   This Court also has

supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

24.   As to Plaintiff Wessels, jurisdiction is also conferred by 28 U.S.C. §1332. Complete diversity among Plaintiff Wessels and all of the defendants exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25.   This Court has jurisdiction over each named defendant who is a resident of New Jersey.  In particular, on information and belief, defendant Carro is a resident of Branchburg, New Jersey, defendant Colleen A. Goggins ("Goggins") is a resident of Princeton, New Jersey, defendant Jorn is a resident of Warren, New Jersey, defendant Ari S. Kellen ("Kellen") is a resident of Teaneck, New Jersey, and defendant Pearson is a resident of Spring Lake, New Jersey.  Additionally, this Court has specific jurisdiction over each named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

26.   Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Valeant  maintains executive offices in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including

the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Valeant occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

27.    Plaintiff Shabbouei was a stockholder of Valeant at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Valeant stockholder.  Plaintiff Shabbouei is a citizen of California.

28.    Plaintiff Wessels was a stockholder of Valeant at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Valeant stockholder.  Plaintiff Wessels is a citizen of Texas.

**Nominal Defendant**

29.    Nominal defendant Valeant is a corporation registered under the laws of the Canadian Province of British Columbia with principal executive offices located at 2150 Saint Elzéar Boulevard West, Laval, Quebec, Canada.  Accordingly, Valeant is a citizen of Canada.  Valeant develops, manufactures, and markets a broad range of pharmaceutical products, over-the-counter products, and medical devices. As of December 31, 2018, Valeant had approximately 21,100 employees.

**Defendants**

30.     Defendant Pearson was Valeant's CEO and a director from February 2008 to May 2016; Chairman of the Board from March 2011 to December 2015; and a paid consultant to the Company from May 2016 to December 2017.  In December 2015, defendant Pearson took a leave of absence for medical reasons; in February 2016 he returned as the Company's CEO and a director and served in those capacities until May 2016.  Defendant Pearson is named as defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").   Defendant Pearson knowingly, recklessly, or with gross negligence caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in its press releases and public filings concerning Valeant's business, prospects, and financial condition.  Valeant paid defendant Pearson the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $669,231 | - | - | $11,304,448 | $11,973,679 |
| 2015 | - | $140,304,682 | $500,000 | $772,760 | $141,577,442 |
| 2014 | $2,007,693 | - | $8,000,000 | $368,235 | $10,375,928 |
| 2013 | $1,750,000 | - | $4,789,531 | $458,203 | $6,997,734 |

Defendant Pearson is a citizen of New Jersey.

- 17 -

31.    Defendant Schiller was Valeant's Executive Vice President and CFO from December 2011 to June 2015; interim CEO from January 2016 to February 2016; a director from September 2012 to June 2016; and a paid consultant to the Company from July 2015 to January 2016.   Defendant Schiller is named as defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act, and sections 11, 12(a)(2), and 15 of the Securities Act.   Defendant Schiller knowingly, recklessly, or with gross negligence caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in its press releases and public filings concerning Valeant's business, prospects, and financial condition.   Valeant paid defendant Schiller the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $813,491 | - | - | $217,571 | $1,031,062 |
| 2015 | $563,963 | - | - | $42,842 | $606,805 |
| 2014 | $953,846 | $23,730,659 | $2,400,000 | $23,067 | $27,107,572 |
| 2013 | $1,000,000 | $1,166,991 | $1,793,123 | $3,872 | $3,963,986 |

Defendant Schiller is a citizen of Colorado.

32.    Defendant Robert L. Rosiello ("Rosiello") was Valeant's Executive Vice President, Corporate Development and Strategy from August 2016 to

December 2016; Executive Vice President and CFO from July 2015 to August 2016; and Executive Vice President from June 2015 to July 2015.  Defendant Rosiello was also a member of Valeant's Office of the CEO from December 2015 to January 2016, at which time defendant Schiller was appointed as the Company's interim CEO. Defendant Rosiello is named as defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Rosiello knowingly, recklessly, or with gross negligence caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in its press releases and public filings concerning Valeant's business, prospects, and financial condition. Valeant paid defendant Rosiello the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|------------------------|-------|
| 2016 | $1,000,000 | $1,000,000 | $2,118,427 | - | $153,504 | $4,271,931 |
| 2015 | $546,154 | $6,000,000 | $53,126,290 | $712,184 | $13,770 | $60,398,398 |

Defendant Rosiello is a citizen of Massachusetts.

33.    Defendant Jorn was Valeant's Executive Vice President and Company Group Chairman from May 2015 to March 2016; Senior Vice President and General Manager of Valeant's dermatology business from September 2014 to May 2015; and Vice President, Marketing Dermatology from August 2013 to September 2014. Defendant Jorn is named as defendant in the related Securities Class Action

complaint that alleges she violated section 10(b) of the Exchange Act.  Defendant

Jorn knowingly, recklessly, or with gross negligence caused or allowed Valeant to:

(i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive

business practices; (iii) overstate its financial metrics; and (iv) make improper

statements in the Company's press releases and public filings concerning the

Company's business, prospects, and financial condition.   Valeant paid defendant

Jorn the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $553,077 | $7,968 | 5,014,488 | - | $12,067 | $5,587,600 |
| 2014 | $396,577 | - | 1,538,192 | $320,827 | $11,505 | $2,267,101 |
| 2013 | $375,650 | - | $1,076,255 | $209,213 | $9,259 | $1,670,377 |

Defendant Jorn is a citizen of New Jersey.

34.    Defendant Carro was Valeant's Corporate Controller from at least June

2012 until March 2016, when she was placed on administrative leave and eventually

replaced in May 2016.   Defendant Carro is named as defendant in the related

Securities Class Action complaint that alleges she violated section 10(b) of the

Exchange Act.  Defendant Carro knowingly, recklessly, or with gross negligence

caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii)

engage in unlawful and deceptive business practices; (iii) overstate its financial

metrics; and (iv) make improper statements in the Company's press releases and

public filings concerning the Company's business, prospects, and financial condition. Defendant Carro is a citizen of New Jersey.

35.     Defendant Kellen was Valeant's Executive Vice President and Company Group Chairman from at least January 2014 to December 2016. Defendant Kellen was also a member of Valeant's Office of the CEO from December 2015 to January 2016.    Defendant Kellen is named as defendant in the related Securities Class Action complaint that alleges he violated section 10(b) of the Exchange Act.    Defendant Kellen knowingly, recklessly, or with gross negligence caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) overstate its financial metrics; and (iv) make improper statements in the Company's press releases and public filings concerning its business, prospects, and financial condition.    Valeant paid defendant Kellen the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $932,692 | $1,000,000 | 2,875,027 | - | $89,915 | $4,897,634 |
| 2015 | $741,316 | $3,000,000 | - | $955,688 | $30,688 | $4,727,692 |
| 2014 | $752,885 | $5,000,000 | $43,085,254 | $1,800,000 | $2,521 | $50,640,660 |

Upon information and belief, defendant Kellen is a citizen of New Jersey or Florida.

36.     Defendant G. Mason Morfit ("Morfit") was a Valeant director from October 2015 to June 2016 and from May 2007 to May 2014. Defendant Morfit is ValueAct's Chief Investment Officer and has been since July 2017; President and

has been since at least November 2013; and a ValueAct Partner and has been since January 2003.  Defendant Morfit joined ValueAct as an Associate in January 2001. Valeant paid defendant Morfit the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $34,127 | $0 | $34,127 |
| 2015 | $13,938 | $218,729 | $232,667 |
| 2014 | $0 | $0 | $0 |
| 2013 | $107,500 | $374,993 | $482,493 |

Defendant Morfit is a citizen of California.

37.    Defendant Robert N. Power ("Power") is a Valeant director and has been since August 2008.  Defendant Power is also a member of Valeant's Audit and Risk Committee and has been since at least April 2016.  Defendant Power is named as a defendant in the related Securities Class Action complaint that alleges he violated section 10(b) of the Exchange Act and section 11 of the Securities Act. Defendant Power knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and financial condition.  Valeant paid defendant Power the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $114,133 | $368,641 | $482,774 |
| 2015 | $116,332 | $381,711 | $498,043 |
| 2014 | $105,729 | $382,496 | $488,225 |

| 2013 | $100,451 | $374,993 | $475,444 |
|------|----------|----------|----------|

Defendant Power is a citizen of Pennsylvania.

38.     Defendant Robert A. Ingram ("Ingram") was a Valeant director from September 2010 to May 2017.  Defendant Ingram was also Valeant's Lead Director from September 2010 to December 2010; Chairman of the Board from December 2010 to March 2011; Lead Independent Director from March 2011 from January 2016; and Chairman of the Board from January 2016 to May 2016.   Defendant Ingram is named as defendant in the related Securities Class Action complaint that alleges he violated section 10(b) of the Exchange Act and section 11 of Securities Act.  Defendant Ingram knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and financial condition.  Valeant paid defendant Ingram the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | $0 | $463,105 | $463,105 |
| 2015 | $100,000 | $487,711 | $587,711 |
| 2014 | $201,547 | $382,496 | $584,043 |
| 2013 | $193,607 | $374,993 | $568,600 |

Defendant Ingram is a citizen of North Carolina.

39.     Defendant  Theo  Melas-Kyriazi  ("Melas-Kyriazi")  was  a  Valeant

director from September 2010 to June 2016.  Defendant Melas-Kyriazi was also a

member of Valeant's Audit and Risk Committee from at least April 2013 to at least

April 2016.  Defendant Melas-Kyriazi is named as defendant in the related Securities

Class Action complaint that alleges he violated section 10(b) of the Exchange Act

and section 11 of Securities Act.  Defendant Melas-Kyriazi knowingly or recklessly

caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii)

engage in unlawful and deceptive business practices; (iii) improperly recognize

revenue; (iv) overstate its financial metrics; and (v) make improper statements in

Valeant's press releases and public filings concerning its business, operations, and

financial condition.   Valeant paid defendant Melas-Kyriazi the following

compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2016 | $51,512 | $51,512 |
| 2015 | $481,354 | $481,354 |
| 2014 | $466,150 | $466,150 |
| 2013 | $486,443 | $486,443 |

Defendant Melas-Kyriazi is a citizen of Massachusetts.

40.    Defendant Norma A. Provencio ("Provencio") was a Valeant director

from September 2010 to June 2016.  Defendant Provencio was also the Chairman of

Valeant's Audit and Risk Committee from at least April 2013 to at least April 2016.

Defendant Provencio is named as defendant in the related Securities Class Action

complaint that alleges she violated section 10(b) of the Exchange Act and section 11

of the Securities Act.   Defendant Provencio knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in Valeant's press releases and public filings concerning its business, operations, and financial condition.   Valeant paid defendant Provencio the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2016 | $64,401 | $64,401 |
| 2015 | $523,859 | $523,859 |
| 2014 | $496,700 | $496,700 |
| 2013 | $522,396 | $522,396 |

Defendant Provencio is a citizen of California.

41.   Defendant Katharine B. Stevenson ("Stevenson") was a Valeant director from September 2010 to March 2016.   Defendant Stevenson was also a member of Valeant's Audit and Risk Committee from at least April 2013 to at least April 2015.   Defendant Stevenson is named as defendant in the related Securities Class Action complaint that alleges she violated section 10(b) of the Exchange Act and section 11 of the Securities Act.   Defendant Stevenson knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in the

- 25 -

Company's press releases and public filings concerning the Company's business, operations, and prospects.   Valeant paid defendant Stevenson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $22,420 | $0 | $22,420 |
| 2015 | $98,519 | $381,711 | $480,230 |
| 2014 | $102,500 | $382,496 | $484,996 |
| 2013 | $102,500 | $374,993 | $477,493 |

Defendant Stevenson is a citizen of Canada.

42.    Defendant Ubben was a Valeant director from October 2014 to August 2015.  Defendant Ubben is the founder and CEO of ValueAct and has been since 2000, and was previously ValueAct's Chief Investment Officer from 2000 to July 2017.  Defendant Ubben is named as defendant in the related Securities Class Action complaint that alleges he violated sections 10(b), 20A, and 20(a) of the Exchange Act.  Defendant Ubben knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and financial condition.  While is possession of material, nonpublic information concerning Valeant's true business health, defendant Ubben sold 4.2 million shares of his

Valeant stock for $925 million in unlawful trading proceeds.  Valeant paid defendant

Ubben the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $60,202 | $381,711 | $441,913 |
| 2014 | $25,000 | $237,535 | $262,535 |

Defendant Ubben is a citizen of California.

43.    Defendant D. Robert Hale ("Hale") is a Valeant director and has been

since August 2015.  Defendant Hale is also a Partner at ValueAct and has been since

January 2011.  Defendant Hale knowingly or recklessly caused or allowed Valeant

to: (i) operate with inadequate internal controls; (ii) engage in unlawful and

deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its

financial metrics; and (v) make improper statements in the Company's press releases

and public filings concerning Valeant's business, operations, and financial condition.

Valeant paid defendant Hale the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $104,551 | $368,641 | $473,192 |
| 2015 | $35,817 | $281,157 | $316,974 |

Upon information and belief, defendant Hale is a citizen of Canada or California.

44.    Defendant Ronald H. Farmer ("Farmer") was a Valeant director from

August 2012 to June 2016.  Defendant Farmer is named as defendant in the related

Securities Class Action complaint that alleges he violated section 10(b) of the

Exchange Act and section 11 of Securities Act.  Defendant Farmer knowingly or

recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) overstate its financial metrics; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. Valeant paid defendant Farmer the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2016 | $54,093 | $54,093 |
| 2015 | $486,590 | $486,590 |
| 2014 | $461,158 | $461,158 |
| 2013 | $476,888 | $476,888 |

Upon information and belief, defendant Farmer is a citizen of Canada.

45.    Defendant Goggins was a Valeant director from May 2014 to June 2016.  Defendant Goggins is named as defendant in the related Securities Class Action complaint that alleges she violated section 10(b) of the Exchange Act. Defendant Goggins knowingly or recklessly caused or allowed Valeant to: (i) operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) overstate its financial metrics; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects.  Valeant paid defendant Goggins the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $43,227 | $0 | $43,227 |
| 2015 | $96,578 | $381,711 | $478,289 |
| 2014 | $62,614 | $382,496 | $445,110 |

Defendant Goggins is a citizen of New Jersey.

46.     The defendants identified in ¶¶30-35 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶30-31, 36-45 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶37, 39-41 are referred to herein as the "Audit and Risk Committee Defendants."  Collectively, the defendants identified in ¶¶30-45 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

47.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Valeant and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Valeant in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Valeant and not in furtherance of their personal interest or benefit.

48.     To discharge their duties, the officers and directors of Valeant were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue

of such duties, the officers and directors of Valeant were required to, among other things:

(a)     ensure Valeant maintained adequate internal controls over accounting and financial reporting;

(b)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(c)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(d)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(e)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f)     remain informed as to how Valeant conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct

such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties Under the Company's Standards of Business Conduct**

49.    The Individual Defendants, as well as all employees, directors, and officers of the Company, were also required to comply with Valeant's Standards of Business Conduct (the "Code of Conduct").[5]  The Code of Conduct provides that Valeant's policy is to:  (i) "require the highest standard of business ethics and integrity on the part of our employees, members of our Board of Directors and third parties"; (ii) "comply with all applicable laws and regulations of the countries where we do business"; and (iii) "maintain training and other related processes to ensure awareness and promote compliance with the Standards."  The stated purpose of the Code of Conduct is to "[e]mphasize [Valeant's] commitment to ethical behavior and compliance with the law" and "[e]stablish basic standards of legal and ethical behavior," among other things.

---

[5] The Code of Conduct refers to the Company's Standards of Business Conduct dated August 21, 2014.

50.     The Code of Conduct provides that the Company's employees, including its officers and directors, are required to ensure that Valeant records and reports "all data and information accurately, honestly, and in sufficient detail." Further, the Code of Conduct specifically notes the importance of "comply[ing] with accepted accounting practices and internal controls at all times."  In this regard, the Code of Conduct states:

**Financial Reporting and Accounting**

We must comply with accepted accounting practices and internal controls at all times.  All assets, liabilities, revenues and expenses of Valeant are to be entered in the Company's books, records and other documents.  These books, records and documents must also accurately reflect and properly describe the transactions they record in sufficient detail. For example:

> •No undisclosed or unrecorded fund, asset or account of the Company will be established for any purpose.
>
> •No false or artificial entries will be made in the books, records or accounts of the Company for any reason, and no employee will engage in any arrangement that results in prohibited entries.
>
> •No payment on behalf of the Company will be approved or made with the intention or understanding that any part is to be used for any purpose other than that described by the supporting document.

Where government accounting regulations apply, we must classify and allocate costs in accordance with those regulations, including cost principles governing cost allowability and relevant contract clauses.

*     *     *

**Pricing**

- 32 -

We will not submit or concur in the submission of any claims, bids, proposals, or other related documents that contain false or fictitious information.

51.   In addition, the Code of Conduct provides that the Company's employees, including its officers and directors, shall ensure that Valeant's public filings and communications "comply fully with all applicable securities laws, rules and regulations, including with respect to press releases, disclosure and trading in the Company's shares."  The Code of Conduct states:

**<u>The Standard</u>**

As a publicly traded company, Valeant must ensure that all of its public disclosures comply with Canadian and U.S. securities laws.  These laws apply not only to disclosure documents that are filed with the various securities regulators, but also to press releases, presentations to securities analysts and other disclosures that are reasonably likely to be disseminated to investors in Valeant securities.   No disclosure document may misrepresent a material fact or omit a material fact needed to avoid misleading the reader.   A fact is "material" if a reasonable investor would consider it to be significant when deciding whether to purchase, sell, or hold Valeant securities.

All disclosure must be made in accordance with Valeant's **Corporate Disclosure Policy** and any applicable disclosure standard operating procedures.

\*     \*     \*

In addition, we must comply in all respects with the laws, rules and regulations regarding trading in the securities of publicly traded corporations and must specifically refrain from trading while in possession of material non-public information.  The use of non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is both unethical and illegal.

- 33 -

* * *

**Particular Areas of Concern**

**Press Releases and Other Public Communications**

None of us can make or disseminate any public statement regarding the operations of the Company unless prior approval has been obtained from the Disclosure Committee and the Head of Investor Relations.

**Selective Disclosure**

U.S. federal securities laws prohibit selective disclosure of financial and other corporate information. We cannot selectively disclose non-public information to securities analysts or members of the media or public.

**Additional Duties of the Audit and Risk Committee Defendants**

52.    In addition to these duties, under the Audit and Risk Committee Charter in effect during relevant times, the Audit and Risk Committee Defendants, defendants Melas-Kyriazi, Power, Provencio, and Stevenson, owed specific additional duties to Valeant. Pursuant to its Charter, the Audit and Risk Committee is responsible for assisting the Board in monitoring and overseeing: (i) the integrity of Valeant's financial statements, including disclosure controls and internal controls over financial reporting; (ii) the performance of Valeant's internal audit function and independent auditors; (iii) Valeant's compliance with the Code of Conduct and legal and regulatory requirements; and (iv) the processes in place to identify, assess, monitor, and control critical risks facing Valeant and its subsidiaries, including regulatory risks.

53.     In overseeing the integrity of the Company's financial statements, the Audit and Risk Committee Charter provides that the Audit and Risk Committee shall:

(a)   review Valeant's accounting policies and practices and the annual financial statements to be included in Valeant's Annual Report on Form 10-K and the related Management's Discussion and Analysis of Results of Operations and Financial Condition with Valeant's financial management and the independent auditors. Recommend to the Board of Directors whether the audited financial statements should be included in Valeant's Form 10-K;

(b)   meet with the independent auditors to review their report on the results of their examination, including their opinion and any related comments. Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit;

(c)   secure the independent auditors' views about the appropriateness, not just the acceptability, of Valeant's accounting policies and practices and the clarity of the financial disclosures used by management;

(d)   secure the independent auditors' views about whether management's choices of accounting policies are conservative, moderate or aggressive and as to whether alternative choices of policies would present a materially different financial position and results of operations. Resolve any disagreements between the independent accountants and management; and

(e)   review with the independent auditors any audit problems or difficulties and management's response. Determine that no restrictions were placed by management on the scope of their examination or its implementation and that there was a free exchange of information.

*     *     *

(a)    review with Valeant's financial management and independent auditors and approve the quarterly financial statements to be included in Valeant's quarterly reports on Form 10-Q and the related Management's Discussion and Analysis of Results of Operations and Financial Condition;

(b)    review and discuss with management the earnings press releases, and financial information and earnings guidance provided to securities analysts and ratings agencies; and

(c)    review quarterly communications from the independent auditors required by applicable laws, regulations, or accounting standards.

54.    The Audit and Risk Committee is also required to exercise oversight over Valeant's internal control function.  Among other things, the Audit and Risk Committee Charter obliges the Audit and Risk Committee to:

(a)    review with the independent auditors, the internal auditors and Valeant's financial management the adequacy and effectiveness of Valeant's internal controls and elicit any recommendations they may have for improvement;

(b)    oversee the internal audit function;

(c)    discuss with the internal auditors and independent auditors the resources, staffing and budget of the internal audit function;

(d)    annually review the performance of the internal audit function with the board of directors and review and approve the appointment and replacement of the head of the internal audit function;

(e)    review significant internal control deficiencies, disclosure policy deficiencies and management or employee fraud identified in connection with the CEO and CFO certifications provided to the SEC and with respect to Management's Report on Internal Control over Financial Reporting, which is included in the Annual Report on Form 10-K;

(f)   establish procedures for the receipt, retention and treatment of complaints received by Valeant regarding accounting, internal accounting controls or auditing matters and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters (the "Business Ethics Reporting Policy");

(g)   review and assess the adequacy of the Business Ethics Reporting Policy on an annual basis. The Committee shall oversee the administration and implementation of the Business Ethics Reporting Policy in accordance with its terms, including all required liaison with Valeant's Chief Compliance Officer and General Counsel in accordance with the Business Ethics Reporting Policy. The Committee shall, on a quarterly basis, certify to the CEO and the CFO that, other than as disclosed to the CEO and the CFO, there have been no matters reported to the Committee under the Business Ethics Reporting Policy that would impact the certifications to be provided by the CEO and the CFO under applicable securities legislation or stock exchange requirements;

(h)   review reports of management concerning the integrity of Valeant's management information systems and report to the Board regarding such review;

(i)   review with management the skills, competencies and adequacy of resources of Valeant's finance organization.

55.     In addition, the Audit and Risk Committee is responsible for assisting

the Board with overseeing Valeant's risk management, including:

(a)   discussing with management Valeant's major financial risk exposures and the steps management has taken to monitor and control such exposures, including Valeant's risk assessment and risk management policies;

(b)   taking into account the reports of Valeant's management, the Chief Compliance Officer, and such other persons as the Committee may consider appropriate, the Committee shall review the policies,

procedures and systems implemented by management to manage the material risks of Valeant's business;

(c)   monitoring the appropriateness and effectiveness of Valeant's risk management systems and policies, including evaluating on a regular basis the effectiveness and prudence of senior management in managing the operations of Valeant and the risks to which Valeant is exposed;

(d)   considering and providing advice to the Board, when appropriate, on the risk impact of any strategic decision that the Board may be contemplating; and

(e)   directing analysis on other broad risk areas.

56.    Finally, the Audit and Risk Committee is tasked with reviewing the processes and procedures established by Valeant to ensure that the Company complies with the Code of Conduct as well as applicable legal and regulatory requirements, and monitoring Valeant's adherence to such requirements.  In carrying out these responsibilities, the Audit and Risk Committee is required to:

(a)   subject to Board approval, establish, review and update annually Valeant's Standards of Business Conduct (the "Conduct Standards") with a view to complying with all applicable rules and regulations and satisfy itself that management has established a system to enforce such Conduct Standards;

(b)   review, approve and receive regular reports from management (including quarterly reports from Valeant's Chief Compliance Officer) with respect to compliance with Valeant's Conduct Standards; and

(c)   investigate or cause to be investigated any reports of non-compliance with or potential violations of the Conduct Standards.

*   *   *

(a)  review regular reports from management (including quarterly
     reports from Valeant's Chief Compliance Officer) and Valeant's
     legal counsel on significant legal and regulatory requirements
     (including United States Federal Health Care Program
     requirements and United States Food and Drug Administration
     requirements, and the obligations under the Corporate Integrity
     Agreement between The Office of the Inspector General of the
     United States Department of Health and Human Services and
     Valeant (the "CIA")) to which Valeant is subject and the
     compliance program in place to ensure compliance with these
     requirements;

(b)  discuss with management any correspondence with or any
     published reports of regulators or governmental agencies, which
     may have a material effect on the business of Valeant, or which
     raise material issues regarding the compliance policies of Valeant
     or adherence thereto; [and]

(c)  review the U.S. marketing practices and guidelines of Valeant,
     including a comparison with industry practices and guidelines, and
     make recommendations to the Board regarding suggested
     revisions, if any, to such practices and guidelines[.]

**Breaches of Duties**

57.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Valeant, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

58.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i)

operate with inadequate internal controls; (ii) engage in unlawful and deceptive business practices; (iii) improperly recognize revenue; (iv) overstate its financial metrics; and (v) make improper statements to the public and the Company's stockholders.  These improper practices wasted the Company's assets, and caused Valeant to incur substantial damage.

59.    The Audit and Risk Committee Defendants had a duty to review the Company's earnings, press releases and regulatory filings.  The Audit and Risk Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Valeant's public statements and internal control functions.

60.    Defendant Ubben further breached his duty of loyalty by selling Valeant stock on the basis of material, nonpublic information before that information was revealed to the Company's stockholders.

61.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Valeant, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Valeant has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Valeant, as to the Company's operations, financial condition, and compliance policies; (ii) deceive and exploit customers and third-party payors through an improper price-gouging scheme and other deceptive business practices; (iii) facilitate defendant Ubben's illicit sale of over $925 million of his Valeant shares while in possession of material, nonpublic information; and (iv) enhance the Individual Defendants' executive and directorial positions at Valeant and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

- 41 -

64.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

65.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution and indemnification; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

66.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing,

substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VALEANT'S AGGRESSIVE GROWTH BY ACQUISITION STRATEGY

68.    In February 2008, Valeant appointed defendant Pearson to serve as its new CEO.  Under Pearson's direction, Valeant implemented an aggressive growth-by-acquisition strategy.  While traditional pharmaceutical companies spend 15-20% of revenues on research and development of new medications to treat and cure disease, Valeant cut R&D spending to 3% and focused on acquiring pharmaceutical companies with already-established products to sell.

69.    Executing defendant Pearson's strategy, between 2008 and 2015, Valeant purchased more than 100 pharmaceutical companies and drug portfolios. The  Company's  notable  acquisitions  include:  (i)  Medicis  Pharmaceutical Corporation ("Medicis") for $2.6 billion in December 2012; (ii) Bausch & Lomb Holdings Incorporated ("Bausch & Lomb") for $8.7 billion in August 2013; (iii) Salix Pharmaceuticals, Ltd. for $14.5 billion in April 2015; and (iv) Sprout Pharmaceuticals, Inc. ("Sprout") in October 2015 for approximately $1 billion. Through these acquisitions, Valeant acquired a portfolio of pharmaceuticals that were vulnerable to uncontrolled price increases.

70.    Several of the drugs Valeant acquired were considered "orphan drugs," which are used to treat rare medical conditions.  Due to the small population that

these drugs service, orphan drugs face little to no competition in the market, providing the manufacturer with monopoly pricing power despite being past the point of protection from generic equivalents. Further, orphan drugs have patients who depend on them, often for survival, and are effectively captive to their prescriptions. Valeant also targeted areas of the pharmaceutical market where there was no significant competition from other major drug manufacturers, such as the dermatology sector.

### VALEANT ENGAGES IN A NUMBER OF UNLAWFUL BUSINESS PRACTICES DESIGNED TO CREATE THE FALSE APPEARANCE OF ORGANIC GROWTH

**Valeant's Price Gouging Scheme**

71.     Valeant's acquisition strategy left it with a massive amount of debt. At the end of 2014, Valeant had $15.2 billion in debt and only $323 million in cash, and by September 2015, Valeant's debt had ballooned to $30.7 billion.

72.     To generate the revenue necessary to carry its heavy debt load and combat declining revenue, Valeant repeatedly and systematically increased prices for its pharmaceuticals far beyond industry norms. For instance, two days after acquiring the rights to Nitropress® and Isuprel from Marathon Pharmaceutical, LLC ("Marathon")—drugs used to treat acute heart conditions—Valeant increased the prices of the drugs by 212% and 525%, respectively. The Company employed similar tactics with dozens of other drugs.

73.     According to a 2015 Deutsche Bank report, Valeant raised fifty-six of its brand-name drugs by an average of 66%, five times more than any other pharmaceutical company in the industry.  The Company increased the price of Cuprimine and Syprine, drugs used to treat Wilson's disease, by more than 5,800% (to over $26,000 per 100 capsules) and 3,200% (to over $21,000 per 100 capsules), respectively, even though Valeant had expended little or no funds on additional R&D related to these drugs.  These pharmaceuticals also had significantly high margins.  Internationally, Valeant sold Cuprimine for approximately 1% of its U.S. price, selling it for $240 in Brazil and $350 in Canada.  Likewise, while Valeant charges nearly $300,000 per year in the U.S., Syprine costs only $1 a pill in other countries.

74.     As further examples of Valeant's extreme price hikes, the Company also dramatically increased the price of: (i) Carac® Cream, a treatment for precancerous lesions, by more than 1,200%, from $230 per tube to over $2,800; (ii) Glumetza®, a drug used to control blood sugar for people with type 2 diabetes, by more than 1,100%, from $900 per ninety tablets to over $10,000; (iii) Targetin®, a treatment for skin problems associated with T-cell lymphoma, by over 1,600%, from $1,800 per tube to over $30,000; (iv) Wellbutrin XL®, an anti-depressant drug, to $1,400 per one month's supply while the generic alternative sells for $30; and (v)

Addyi®, a drug referred to as "female Viagra," by 100% immediately after acquiring the drug from Sprout.

**Valeant Inflates Sales Through a Clandestine Network of Captive Pharmacies Philidor**

75.     To ensure that its exorbitantly overpriced drugs sold in a competitive pharmaceutical market, Valeant applied a sales strategy known internally as "alternative fulfillment," or "AF," by which the Company was able to shield its products from competition through the creation of a network of controlled specialty pharmacies.  Since independent pharmacies serve as a check on price gouging by encouraging the substitution of cheaper products, Valeant routed prescriptions away from independent pharmacies and into pharmacies it secretly controlled.  The most prominent of these captive pharmacies, and the hub of Valeant's network, was Philidor.

76.     While Philidor was made to look like an independent specialty pharmacy operated by A. Davenport,[6] in reality, Valeant exercised complete control over Philidor. Valeant was Philidor's only client and Philidor dispensed only Valeant's undifferentiated brand-name drugs—primarily the Company's

---

[6] Philidor's owners include A. Davenport, Matthew S. Davenport ("M. Davenport"), and Gregory Blaszczynski ("Blaszczynski"), each of whom previously worked at BQ6 Media Group LLC ("BQ6"), a marketing firm that consulted for Valeant and shared a Pennsylvania address with Philidor.

dermatological products—many of which had low-cost generic substitutes.  Valeant was inextricably linked to Philidor's operations, business, and development since its incorporation.  On January 2, 2013, the same day Philidor was incorporated, Valeant hired Laizer D. Kornwasser ("Kornwasser"), a former senior executive at Medco Health, to serve as Valeant's Executive Vice President and Company Group Chairman to oversee Valeant's relationship with Philidor.

77.     In interviews with *Reuters* and the *Wall Street Journal*, former Valeant and Philidor employees confirmed that Valeant employees worked with the founders of Philidor to set up the business in 2013, worked at Philidor in its infancy, assisted in expanding its operations, and remained closely involved in running the pharmacy thereafter.  For instance, according to a *Reuters* report, titled "Insight—Valeant Played a Key Role in Building, Operating Philidor Rx," Kornwasser's direct report Tanner, and a number of other Valeant employees, including Bijal Patel ("Patel")[7] and Alison Pritchet ("Pritchet")[8] were responsible for building relationships with specialty pharmacies for dermatology specialist company Medicis prior to its acquisition by Valeant in January 2013. After Valeant acquired Medicis, Patel,

---

[7] According to Patel's LinkedIn page, he has been "Manager, Access Solutions" at Valeant since January 2013 (the same month Philidor was formed).

[8] According to Pritchett's LinkedIn page, she worked at Medicis from 2005 to 2012, then at Valeant until March 2014, then at Philidor as Vice President, Strategic Relationships.

Pritchett, and Tanner collaborated with A. Davenport, who ran BQ6 that did work for Medicis, to establish Philidor.

78.    Former employees interviewed by *Reuters* and a Valeant spokeswoman interviewed by CNBC, reported that Tanner was Valeant's liaison to Philidor. Tanner reported to Kornwasser who in turn reported to defendant Pearson.  Tanner was involved in all aspects of Philidor's operations and traveled frequently between Philidor's offices and Valeant's U.S. headquarters in New Jersey.  According to a former Philidor employee interviewed by *Reuters*, "Tanner had authority 'over all the people who worked at Valeant first and then came over to Philidor.'"

79.    While Philidor effectively operated as a division of Valeant, the Company took careful steps to conceal the relationship between Valeant and Philidor from PBMs, payors, and physicians so that these parties would not view Philidor's allegiance to Valeant products with heightened scrutiny or refuse to reimburse for the price-gouged drugs.  News outlets, including *Bloomberg* and the *Wall Street Journal*, which interviewed former Philidor employees, reported that Valeant employees working at Philidor used aliases such as Jack Reacher (a fictional character based on a series of novels), Peter Parker (the alter ego of Spiderman), and Brian Wilson (of the Beach Boys) to conceal the close ties between Valeant and Philidor.  According to a *Wall Street Journal* article titled, "Valeant and Pharmacy More Intertwined than Thought," Valeant employees used fictitious names "so it

didn't appear Valeant was using the pharmacy to steer patients to the drug company's products."

80.   Valeant solidified its control over Philidor in December 2014.   On December 15, 2014, Valeant rewarded Philidor's owners with a "Purchase Option Agreement," pursuant to which it paid $100 million for the ten-year option to acquire Philidor for $0, plus various milestone payments based on Philidor's sales. Consistent with its efforts to conceal the use of overlapping employees, Valeant structured the transaction to conceal its relationship with Philidor.  The structure of the deal ensured Valeant did not have to publicly disclose the transaction, and, to add an additional layer of secrecy, Valeant used a subsidiary, KGA Fulfillment Services, Inc., to obtain the option to acquire Philidor.

81.   As part of the Philidor Purchase Option Agreement, the transaction documents provided that Valeant was entitled to form a joint steering committee which held regular meetings to "assess and discuss" matters relating to Philidor's "internal policies, manuals and processes."  The agreement provided for meetings and reviews of Philidor's "Strategic Plan" and compliance matters, including Philidor's policies and manuals.  In connection with this deal, Valeant and Philidor also entered into an exclusive distribution and services agreement.  As part of this agreement, Valeant had the right to inspect Philidor's policies and procedures and

conduct site visits to verify Philidor was complying with Valeant's procedures. Accordingly, Valeant controlled Philidor's operations and business.

**Through Philidor, Valeant Created a National Network of Captive Pharmacies**

82.    Valeant used its control over Philidor to extend its captive pharmacy network by creating a number of shell companies affiliated with Philidor through which Valeant acquired interests in smaller retail pharmacies across the country. Through this process, Valeant's fiduciaries developed a network of at least seventy-six controlled specialty pharmacies, including R&O, among others.  This ownership structure was designed to obscure Valeant's close ties to Philidor and minimize scrutiny of their deceptive business practices by creating the appearance that independent pharmacies across the nation were promoting and selling Valeant's exorbitantly priced products on their own volition.

83.    In expanding its corrupt network to cover the entire United States, Philidor provided false information to state licensing bodies and independent pharmacies.  For example, Philidor was not licensed in California, the nation's largest pharmaceutical market, and in August 2013, Philidor requested a permit to operate in California.  M. Davenport submitted the permit application, certifying "under penalty of perjury the truthfulness of all statements, answers, and representations in the application."  While less than 1% of such applications are denied, in May 2014, the California State Board of Pharmacy denied Philidor's

application after finding that Philidor made "false statements of fact with the intent to substantially benefit itself or others on its application for licensure," including false statements regarding the true ownership of Philidor.

84.    To circumvent the denial, and enable it to operate in California, Philidor created Isolani, LLC ("Isolani"), a wholly owned shell company with the sole purpose of acquiring R&O, a licensed California pharmacy operated by Russell Reitz ("Reitz").  Before the sale agreement between R&O and Isolani was executed, Philidor began using R&O's NPI number without R&O's permission and in states where R&O was not licensed.  When Reitz learned of Philidor's improper use of R&O's NPI and complained of this practice, A. Davenport acknowledged the practice and assured Reitz that Philidor had stopped using R&O's NPI.  Despite A. Davenport's assurance, Isolani and Philidor continued to use R&O's NPI number to bill payors for prescriptions dispensed by Philidor.

85.    As Reitz uncovered Philidor's deceptive business practices, he began withholding millions of dollars of prescription reimbursements for Valeant drugs, rather than turning the funds over to Isolani/Philidor.  Thereafter, Reitz received a letter from Valeant's General Counsel, Robert Chai-Onn ("Chai-Onn"), demanding "immediate payment" of more than $69 million to "avoid further damage to Valeant and other parties."  In response, on October 6, 2015, R&O filed a lawsuit against Valeant stating that R&O had no relationship with Valeant, had never received an

invoice from Valeant for any amount, and that either both entities were the victims of fraud perpetuated by third-parties, or Valeant was conspiring with others to defraud R&O.[9]   This litigation ended with Valeant entering into a confidential settlement with R&O.

86.    R&O was not the only pharmacy Philidor exploited.   In September 2014, Philidor affiliate Lucena Holdings, LLC ("Lucena"), acquired a 10% stake in West Wilshire Pharmacy, a California pharmacy.   Filings with the California State Board of Pharmacy listed Sherri Leon ("Leon"), Philidor's Director of Operations, as Lucena's CEO; Blaszczynski, a Philidor owner, as a member of Lucena; and James Fleming ("Fleming"), Philidor's Controller, as a director of Lucena.   The paperwork did not disclose these individuals' affiliations with Philidor, and Leon attested that she was not associated with any entity that had a professional license denied, despite Philidor's prior license denial in California.

87.    Likewise, in 2015, Philidor created the shell company Back Rank LLC ("Back Rank") to buy a controlling interest in Orbit Pharmacy, Inc., ("Orbit") an independent pharmacy based in Houston, Texas. Philidor's general counsel served as Back Rank's general counsel and Philidor's Controller, Fleming, was Back Rank's President.   Following the acquisition, Orbit used Philidor's Horsham, Pennsylvania

_____

[9] *See R&O Pharmacy, LLC v. Valeant Pharmaceuticals North America LLC*, 15-cv-07846 (C.D. Cal. Oct. 6, 2016).

address, the same address shared by BQ6 and a number of Philidor's shell companies. Despite its prior license denial in California, Philidor reported to the Texas State Board of Pharmacy that none of its owners or partners had even been the subject of a professional disciplinary action or been denied a license.

**Valeant Uses Its Network of Controlled Pharmacies to Engage in Unlawful and Deceptive Sales Practices**

88.    Valeant used its nationwide network of shell companies and captive pharmacies to employ a number of unlawful and deceptive tactics to wrongfully obtain payment for its overpriced drugs. One such practice involved employees at Valeant's controlled pharmacies physically altering, modifying, and falsifying physician prescriptions to require that Valeant-branded products be used as opposed to low-cost generic alternatives. Typically, pharmacists who receive a prescription for a branded drug instead dispense a generic substitute when available. Because some alternatives may not be perfect substitutes, physicians are able to preclude the use of low-cost generic alternatives by specifying "dispense as written" on the prescription. According to an October 29, 2015 *Bloomberg* report, Philidor employees confirmed that the Company's controlled pharmacies routinely falsified prescriptions by adding "dispense as written" whenever the prescription included Valeant-branded products and generic substitutes were available. As the employees interviewed in the *Bloomberg* investigation explain, the Company and Philidor employed this practice particularly with respect to Valeant's dermatologic products,

since third-party payors would otherwise deny these claims.  Moreover, if third-party payors denied initial claims for Valeant drugs because the prescription allowed for generic substitutes, Philidor employees modified the prescription code to allow only for the dispensing of Valeant-branded drugs and resubmitted these modified prescriptions.

89.     Additionally, if an insurer rejected a claim for reimbursement, Philidor employees would resubmit the claim with a smaller quantity of drugs so the price would be lower in order to secure insurance approval.  Philidor would then compensate for the smaller quantity by increasing the number of prescription refills in order to secure the maximum reimbursement.

90.     Another practice involved Philidor employees automatically refilling patients' prescriptions.  In an article published by *New York* magazine on January 13, 2016, customers explained that Valeant directed its controlled pharmacies to automatically refill patients' prescriptions for Valeant drugs regardless of whether the patients had actually requested or required refills.  In fact, Valeant submitted renewals even for drugs that treated conditions only requiring one course of treatment.  Because Valeant directed Philidor to waive patient copays by increasing PAPs (as described below), this scheme frequently went undetected, since patients had no incentive to complain.  One Philidor employee explained in an online forum that Philidor routinely auto-shipped Valeant's products even when "most people do

not need these refills" because "it is free for the patient but Philidor gets anywhere from $550-$1220 from the insurance companies."  Furthermore, even when patients actively refused refills, Philidor made it nearly impossible for those patients to decline or cancel the refills.  Thus, the Company deceived third-party payors and PBMs into paying for Valeant products, even when they were unnecessary or unwanted.

91.    In order to circumvent denials of claims for Valeant-branded drugs, Valeant falsified pharmacy identifications to misrepresent to insurance companies and other third-party payors which pharmacies were dispensing the Valeant-branded drugs.  According to several former Philidor employees interviewed by the *Wall Street Journal*, *Bloomberg Businessweek*, and *Reuters*, Philidor's employee manual on how to handle claims instructed employees to submit claims to third-party payors or PBMs first using Philidor's NPI, and if the claim was denied, resubmit the claim using the NPI of another Valeant-controlled pharmacy.  Taylor Geohagan, a former Philidor claims adjudicator, explained in an interview with the Southern Investigative Reporting Foundation that "[p]retty much everything we did in the [Philidor] Adjudication department was to use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

92.    Philidor also reduced regulatory scrutiny and pushback from patients and payors by increasing PAPs so patients paid little or nothing for Valeant's

exorbitantly priced medications.  Valeant increased its PAPs in order to waive or substantially reduce patient copays without disclosing to payors that while they were paying more, patients were paying less.  From 2012 to 2015, Valeant's total spend on PAPs increased by over 1,100% from $53 million to $600 million.

93.    While PAPs are designed to ensure patients can afford necessary medical treatment, Valeant manipulated its PAPs into another deceptive tactic to conceal its price-gouging practices.  Valeant waived or reduced patient obligations for high-priced Valeant drugs to reduce patient complaints, patient refusal to accept unnecessary refills or enrollment in automatic refill programs, and negative publicity.  Insurance companies use copays to control unnecessary costs and reduce fraud by ensuring patients have an incentive to complain and seek generic alternatives if they are prescribed high-priced medications or receive unnecessary refills.    By waiving copays at Valeant's direction, Philidor took away these incentives.

94.    For certain of Valeant's pharmaceuticals, however, copays were not waived, yet Philidor represented to customers that they were.  Valeant deceptively channeled doctors and patients through Philidor by representing to them that Valeant drugs were available at no cost if patients and physicians submitted their prescriptions directly to Philidor.  In furtherance of this scheme, Valeant and Philidor issued coupons to physicians and patients representing that third-party payors would

not be billed if the prescriptions for Valeant-branded pharmaceuticals were submitted directly to Philidor.  Despite these representations, in reality, third-party payors were actually billed for the drugs, and these costs were then passed on to patients.

95.    When customers complained to Philidor about these unauthorized charges, Philidor employees rebuffed their complaints and refused to reverse the charges.   As a result, numerous Philidor consumers submitted complaints to consumer affairs websites highlighting their negative experiences with Philidor. One patient who was charged $220 by her insurance company despite Philidor's assurance she would be charged only $25 voiced her concerns in a complaint to the Better Business Bureau.  The complaint stated:

> Hello. My child had an appointment with a local dermatologist. While we were there we were referred to Philidor RX Services for filling two acne prescriptions. The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company.  She also gave us a coupon to use for one of the prescriptions that would make it free.  I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription).  I contacted Philidor and spoke with a man who said his name was Mickey.  Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account.  I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice.  I have received no response and no refund.

96.    As a result of these deceptive practices, consumers and third-party payors were induced into paying for Valeant's overpriced branded drugs when cheaper generic equivalents were available.

**Valeant Used Its Relationship with Philidor to Artificially Inflate Its Revenue**

97.    Until Valeant's arrangement with Philidor was exposed in October 2015, Valeant used the secret relationship to artificially inflate its revenue in violation of U.S. Generally Accepted Accounting Principles ("GAAP"). Before the formal consolidation of Philidor was completed in December 2014, the Company recorded revenue when it shipped products to Philidor (i.e., on a "sell-in" basis). Once the transaction closed, Valeant would be prohibited from recording revenue for shipping products to Philidor, since that was akin to shipping products to itself. Instead, the Company would only be able to recognize revenue when Philidor dispensed the products to patients. Therefore, directly before the acquisition was formalized, Valeant shipped millions of dollars of products to Philidor and recorded the revenue from these transactions.

98.    This manipulation violated GAAP. As Valeant conceded in its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Form 10-K") filed with the SEC on April 29, 2016, these transactions involved the "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase

option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."   Since Valeant's ability to collect revenue from these transactions was not reasonably assured, GAAP required Valeant to defer revenue and profit until Philidor actually resold the drugs to customers.  *See* Financial Accounting Standards Board, Accounting Standards Codification ("ASC") Topic 605-15-25-1.  Revenue obtained from certain of Valeant's sales to Philidor leading up to the acquisition, were thus not "earned," and therefore not appropriately recognized as revenue.

99.   Valeant's revenues were further artificially inflated as a result of the Company double-booking revenue on these transactions.  After Philidor acquired the purchase option in December 2014, Philidor recorded revenue from Valeant pharmaceuticals when the drugs were dispensed to patients, despite the fact that Valeant had already recorded revenue when it shipped the drugs to Philidor.  Since Valeant's and Philidor's financials were consolidated at the time, this resulted in a double counting of revenue for these transactions.  In a Current Report on Form 8-K filed with the SEC on March 21, 2016, the Company admitted that certain revenue had been double counted, stating: "[R]evenue that is being eliminated from 2014 does not result in an increase in revenue to 2015 as a result of the Company having previously also recognized that revenue in 2015."

100.   As a result of this improper accounting scheme, Valeant's reported revenues in 2014 and 2015 were significantly overstated.  For fiscal year 2014, the Company overstated revenue by $57.5 million, and for the first quarter ended March 31, 2015, the Company overstated revenue by $20.8 million.  These overstatements were significant to the Company.  For example, the Company would not have met analysts' expectations for the fourth quarter of 2014, had it not improperly recognized revenue on a "sell-in" basis on its transactions with Philidor.

101.   Although the manipulation described above violated GAAP, the Audit and Risk Committee, including defendants Provencio, Melas-Kyriazi, and Stevenson, and the entire Valeant Board approved the improper accounting practices.  Slides that correspond to the Company's October 26, 2015 investor call state that the "Finance and Transactions Committee, Audit and Risk Committee and Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

## THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY RESULT IN A SERIES OF IMPROPER STATEMENTS

102.   In order to finance its acquisitions and perpetrate the scheme detailed above, Valeant's fiduciaries sought to convince investors of the long-term value of their strategy and assuage analyst concerns that Valeant's acquisition-centric model was limited by fewer acquisition targets and increasing levels of debt financing. Valeant repeatedly stressed to investors and the broader market that the Company's

dramatic year-on-year revenue growth was the result of Valeant's ability to expand the markets for its pharmaceuticals and increase the volume of sales for its acquired products. In addition, Valeant routinely assured investors and analysts that the Company had strong internal controls and compliance programs, and that its accounting practices complied with GAAP.

103.   On January 4, 2013, the Company held a conference call with analysts and investors to discuss its financial outlook for fiscal year 2013. During the call, defendants Pearson and Schiller made a number of statements concerning Valeant's purportedly sustainable business model, the Company's financial prospects, and the benefits of its alternative fulfillment initiative. In particular, defendant Pearson stated:

> 2012 was another very strong year for Valeant. From a top line perspective we added over $1 billion in revenue in 2012.... On the bottom line, we delivered cash [earnings per share ("EPS")] growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model***.
>
> ***Our businesses continued to deliver strong organic growth***, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

104.   During the question and answer portion of the conference call, Douglas Miehm, an analyst with RBC Capital Markets ("RBC") questioned defendant Pearson about pricing for Solodyn®, a dermatological product Valeant acquired in the Medicis transaction. Defendant Pearson replied:

Sure. ***In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer. Through the AF programs, it will allow us our sort of average price internally to go up, because of the way that system works.***

105.   Defendant Pearson continued to tout Valeant's alternative fulfillment initiative in response to a question from Stifel Nicolaus analyst Annabel Samimy regarding Valeant's AF program, stating:

Yes, the more we understand about it the more excited we get about it, ***quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III. And there's some exciting opportunities there that we're not going to give specifics of. And also as we had hoped, we think it will apply to more than just Solodyn. Ziana is actually also being – already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US***.

106.   When asked by Jefferies & Company analyst Corey Davis the percentage of Solodyn revenue that would go through the AF program, defendant Pearson stated that it would increase because there was "evidence" alternative fulfillment was working, stating:

Well the last question, it's much – it will be much closer to 50% than 10%, that's for sure. And yes, what we – ***the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work.***

107.   Another analyst asked defendant Pearson why he was "so encouraged by the AF strategy when net sales have been heading in the wrong direction for the

one case study we can observe, Solodyn?"  In response, defendant Pearson stated

that the alternative fulfillment channel had "incentives" in place to get paid for drugs

that were being rejected by retail pharmacies, stating:

> And again, Medicis is still learning and we're just still learning about what we can do with these AF scripts.  So when someone actually makes the call or sends the script to the alternate channel, what can be done with that.  And a number of things can be done.  One is you can continue to try to adjudicate the claim just because the claim was or *just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it*.  If you think about the retail pharmacist, the retail pharmacist doesn't have a huge incentive to work hard to get that script reimbursed.  In fact you might argue they have the opposite incentive, because they get paid more if they convert it to a generic.
>
> *So, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then – so there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid.*
>
> \*   \*   \*
>
> So, I think through as we continue to learn about this *AF program, there are some things that we can do that might actually change the direction in terms of so rather than see a decline in Solodyn, if we're really successful we can begin starting to grow that product again.* So it's things like that that sort of start giving us some real optimism in terms of what you can do, *and how this program can sort of turn out to a much better case than assuming you didn't have the AF program*.

108.   During the Company's earnings conference call with analysts and

investors to discuss its financial and operating results for the fiscal year ended

December 31, 2012, held on February 28, 2013, defendants Pearson and Schiller

continued to highlight Valeant's supposedly "strong organic growth" and tout the

- 63 -

benefits of its alternative fulfillment strategy.  For instance, defendant Pearson stated:

> *Organic growth continued to be strong for both the quarter and the year.  We are particularly pleased to report a return to positive growth for our Neuro and Other business after six quarters of decline.*  As we mentioned earlier this year, we expect US Neuro and Other business to continue to grow throughout 2013.  We also note the continued very strong growth in the emerging markets despite significant economic headwinds this year.

109.   During the question and answer portion of the earnings call, analysts continued to focus on Valeant's alternative fulfillment initiative.  In response to a question about the Company's AF program, defendant Pearson assured analysts and investors that it was working well, stating:

> *The program is working actually quite well.  We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call.* And we are, obviously, looking at other products that could run through this system.  Currently, it's just Ziana and Solodyn.  But certainly, probably by mid year, there will be a number of other products that we will be using alternate fulfillment as well.

110.   When Fred Garcia, an analyst with RBC, pressed defendant Pearson for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to [Valeant's] growth," defendant Pearson vaguely stated that it had increased sales volumes but refused to disclose the improper sales practices, stating:

> *We have never given details. Medicis never gave details. And that was probably a smart practice. We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not. What we can reiterate is that all of our key brands in dermatology*

*since our sales force meeting are now growing*.

111.   On May 3, 2013, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2013 (the "Q1 2013 Form 10-Q") with the SEC.  The Q1 2013 Form 10-Q stated that "pricing and sales volume of certain of [Valeant's] products … are distributed by third parties, over which we have no or limited control," but failed to disclose that Valeant controlled Philidor and had significant influence over Philidor.[10]  The Q1 2013 Form 10-Q also represented that management's disclosure controls and procedures were effective, stating: "Our management, with the participation of our CEO and [CFO], *has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013."*

112.   The Q1 2013 Form 10-Q was signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Pearson and Schiller.  Defendants Pearson's and Schiller's certifications acknowledged their responsibility

---

[10] The notion that Valeant had "no or limited control" over the pricing and sales volume of drugs in the hands of third-parties was repeated in subsequent filings with the SEC until October 2015, when Valeant's control of Philidor was revealed.  In fact, the Company made identical misleading statements in its subsequent Quarterly and Annual Reports filed on: (i) August 7, 2013; (ii) November 1, 2013; (iii) February 28, 2014; (iv) May 9, 2014; (v) August 1, 2014; (vi) October 24, 2014; (vii) February 25, 2015; (viii) April 30, 2015; and (ix) July 28, 2015.

"for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting … for [Valeant]," and incorrectly stated that they had:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.[11]

---

[11] Substantially similar statements concerning the Company's internal controls over financial reporting were contained in each of the Company's subsequent Quarterly and Annual Reports filed on: (i) August 7, 2013; (ii) November 1, 2013; (iii) February 28, 2014; (iv) May 9, 2014; (v) August 1, 2014; (vi) October 24, 2014; (vii) February 25, 2015; (viii) April 30, 2015; and (ix) July 28, 2015.

113.   On June 11, 2013, the Company presented at the Goldman Sachs Healthcare Conference.  During the presentation, Gary Nachman, a Goldman Sachs analyst, questioned defendant Schiller about Valeant's "alternative fulfillment program," and whether it was "stabilized."  In response, defendant Schiller noted that it was increasing profits and that AF was a trend in "the whole pharmaceutical industry," stating:

> Alternative fulfillment, I think a couple things. One is, to me, ***the alternative fulfillments was an example of what the whole pharmaceutical industry – certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts***. There was a day when you could call on anybody, and almost any script was profitable. Those days are gone. ***So segmenting your customer base and really focusing on profitability*** has got to be the future***. And that's – alternative fulfillment was the beginning of that journey, but not the endpoint***.

> So I probably think under Medicis, ***alternative fulfillment*** was held out a little bit too much as the holy grail. I really think it's – it's actually the starting points, and in some ways, it was quite a clumsy starting point. It wasn't that different, but ***it's a process where we have generation two and generation three. But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of co-pay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it.  … Yes, I think – I'm hoping – we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits. And that's really the focus, is growing profits***.

114.   On July 29, 2013, the Company filed a Current Report on Form 8-K with the SEC attaching a memorandum to employees of Valeant and Bausch &

Lomb[12] and a copy of the anticipated organizational chart of the combined company upon closing of the merger. The memorandum explained that Valeant was focused ensuring adequate internal controls to protect stockholders as well as ensuring regulatory compliance.  In particular, the memorandum stated:

> *In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe / recommend them and the customers who provide retail outlets for these products. Healthcare companies are held by society to the highest possible ethical standard – and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective*.

*   *   *

> Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on three things:

> 1.  *Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements*.

115.   On August 7, 2013, the Company held an earnings conference call with analysts and investors to discuss its financial and operating results for the second quarter ended June 30, 2013. During the question and answer portion of the call, Lennox Gibbs, an analyst with TD Securities, asked defendant Pearson whether Valeant would need to adopt "more of a mainstream strategy" to "become one of the

---

[12] On May 27, 2013, the Company announced it had entered into a definitive agreement pursuant to which Valeant would acquire Bausch & Lomb for $8.7 billion in cash, and on August 6, 2013, the Company announced that it had completed the acquisition.

world's largest healthcare companies."  In response, defendant Pearson continued to

defend Valeant's purportedly superior nontraditional acquisition strategy, stating:

> I don't – I think we would plan to have our same model. ***We think we***
> ***can be successful by not doing what large pharma companies are***
> ***doing, and that's been our strategy, that will continue to be our***
> ***strategy. And so we're not looking to get into the traditional –*** we're
> not going to go – therapeutic areas are largely driven by R&D in terms
> of why people organize that way***, and we don't plan to spend – increase***
> ***our R&D spend as a percent of sales to what other companies are***
> ***doing. And we'll continue to focus on both specialty segments*** and
> attractive geographic markets.

116.   Defendant Pearson also assured analysts and investors that there were

no increased compliance risks accompanying Valeant's nontraditional strategy.  In

particular, defendant Pearson stated:

> ***In terms of compliance, compliance is obviously very, very important***
> ***for us.*** And has to be for every pharmaceutical company. And actually
> I was – I just got the employee survey that we send out every year. And
> we have a huge response rate, well over 50%, and even higher in the
> emerging markets. When people come back and they rate our Company
> on our most positive attributes and our most negative attributes, and at
> the very top of the list of the positive is ethical. So our employees really
> do appreciate it. ***That's our most important thing that – that comes***
> ***before everything.***

117.   On October 31, 2013, Valeant issued a press release announcing its

financial and operating results for the third quarter ended September 30, 2013.  The

press release highlighted Valeant's rapid growth, stating that "Valeant's Developed

Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012"

and that "[t]he growth in the Developed Markets was driven by continued

improvement in many of our Dermatology prescription brands, our aesthetics and oral health portfolios, our orphan drug products and CeraVe."

118.   On January 7, 2014 the Company held a conference call with investors and analysts to discuss its financial outlook for fiscal year 2014.   During the call, defendant Pearson assured investors and analysts that Valeant's growth in sales volume was due to its business strategy.   Defendant Pearson compared Valeant's performance in 2013 to its average performance from 2009 through 2012, and explained that the Company's "continuing track record of consistent strong performance in terms of growth in revenues, earnings," and stockholder returns was a result of "achieving strong organic growth in a fiscally responsible manner for the products that [Valeant] already own[s] … and over-achieving in terms of improving growth rates and extracting cost synergies."

119.   That same day, the Company participated in the Goldman Sachs Healthcare CEOs Unscripted: A View from the Top Conference.   In response to a question about the Company's dermatology business and Valeant's AF program, defendant Pearson refused to discuss details and continued to conceal the deceptive practices, stating:

> **The AF program** was I think rolled out a little bit too quickly and there were lots of bugs in it and **we have a next generation that we're going to – which we are implementing, which we aren't going to talk about the details of,** but net-net I think Solodyn, it's a lot less important to us now than when we – than it was to
> Medicis obviously.

- 70 -

120.   On February 27, 2014, the Company issued a press release announcing its financial and operating results for the fourth quarter and year ended December 31, 2013.   According to the press release, increased volume of dermatology sales was the key driver of Valeant's growth.   The press release stated:

> Valeant's Developed Markets revenue was $1.6 billion, up 122% as compared to the fourth quarter of 2012. This increase was primarily led by the acquisition of Bausch + Lomb, which was completed on August 5, 2013. Same store organic product sales growth was 13%, excluding the impact of the genericization of the Zovirax franchise, Retin-A Micro and BenzaClin. ***The growth in the Developed Markets was driven by continued growth in certain dermatology prescription brands***, ***our aesthetics, consumer, neurology and other and oral health portfolios***, and our Canadian business unit.

121.   Later that day, the Company hosted an earnings conference call with analysts and investors to discuss its financial results.   During the call, defendant Pearson discussed Valeant's growth in neurology, explaining: "***When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally. And so we have been able to take advantage of that and grow those products.***"

122.   On February 28, 2014, Valeant filed its Annual Report on Form 10-K with the SEC, which reaffirmed the Company's financial results previously announced (the "2013 Form 10-K").   The 2013 Form 10-K included several statements touting the Company's supposedly "lower risk" business strategy.   For example, the 2013 Form 10-K stated:

*The growth of our business is further augmented through our lower risk research and development model. This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.[13]*

123.   In addition, the 2013 Form 10-K repeated the notion that Valeant had "no or limited control" over the pricing and sales volume of drugs in the hands of third parties, and addressed generic competition, claiming that "*[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care.*"

124.   The 2013 Form 10-K also addressed Variable Interest Entities ("VIE").[14] Although, Philidor was a VIE under GAAP, in Note 2 to its Consolidated Financial Statements—titled "Significant Accounting Policies"—in its 2013 Form 10-K, the Company represented that Valeant did not hold any interests in VIEs, stating: "*[t]here were no material arrangements determined to be variable interest entities.*"

---

[13] The notion that Valeant employed a "lower risk" business model was repeated in the Company's subsequent filings with the SEC.  For instance, this exact statement appears in Valeant's March 16, 2015 offering documents as well as Valeant's Quarterly Reports filed on:  (i) May 9, 2014; (ii) August 1, 2014; (iii) October 24, 2014; (iv) April 30, 2015; (v) July 28, 2015; and (vi) October 26, 2015.

[14] GAAP defines a VIE as a legal entity that is subject to consolidation.

125.  The 2013 Form 10-K was signed by defendants Pearson, Schiller, Ingram, Farmer, Melas-Kyriazi, Morfit, Power, Provencio, and Stevenson, and contained SOX certifications by defendants Pearson and Schiller, attesting that the financial information contained in the 2013 Form 10-K was accurate and disclosed any material changes in the Company's internal control over financial reporting.

126.  Even when other companies publicly criticized Valeant's business model, Valeant continued to deny that its business model was unsustainable.  In a press release issued on April 22, 2014, the Company announced that it had submitted a merger proposal to Allergan's board of directors "under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock." According to the press release, the proposal was made with the full support of Ackman and Pershing Square Capital Management, L.P. ("Pershing Square"), which had rapidly accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's single largest stockholder.

127.  On May 8, 2014, Valeant issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2014. The press release reported on Valeant's continued trend of extraordinary growth, including revenue growth which represented "an increase of 77% over the prior year," and "[e]xceeded [Valeant's] expectations," along with "[p]ositive organic growth in the U.S...."  The press release quoted defendant Pearson as stating:

"*[Valeant's] first quarter results demonstrate the strong, durable nature of [its] diversified business model*."

128.   That same day, Valeant hosted an earnings conference call with investors and analysts to discuss its first quarter 2014 financial results.  During the question and answer portion of the session, Andrew Fickelstein, an analyst with Susquehanna Financial Group, asked defendant Pearson to discuss "the drivers of organic growth" and questioned whether the Company was doing anything differently in marketing or "improving the gross to nets" on its dermatology products.  In response, defendant Pearson stated:

> I think the other thing is – that *we've worked on is a much more sophisticated alternate fulfillment system that we've implemented the US, which is really helping.* Those scripts don't show up in IMS, in terms of what's doing*, but we're very pleased that Solodyn is now growing. And we've applied that to a number of our other products, which is also helping in terms of the growth*.

129.   On May 9, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC for the first quarter ended March 31, 2014, which reaffirmed the Company's financial results previously announced (the "Q1 2014 Form 10-Q").  The Q1 2014 Form 10-Q was signed and certified as accurate by defendants Pearson and Schiller, and included a number of statements concerning the Company's purportedly lower risk business strategy.  For instance, the Q1 2014 Form 10-Q stated:

*The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*.

130.   On May 12, 2014, Allergan issued a press release formally rejecting Valeant's bid "due to the uncertainty surrounding Valeant's long term growth prospects and business model" and the Allergan board's belief "that the Valeant business model is not sustainable."  During a conference call later that same day, Allergan's CEO, David E.I. Pyott ("Pyott") cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches.  Pyott further advised investors to "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

131.   On May 27, 2014, Allergan filed a Form 8-K with the SEC, attaching a slide presentation which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)."  According to the presentation, titled "Certain Potential Business Risks and Issues with Valeant Pharmaceuticals International, Inc.," much of Valeant's growth was attributable to "unsustainable price increases – not volume."  The presentation also pointed to Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

132.   In the days and weeks following these allegations, Valeant refuted Allergan's claims and continued to misrepresent the Company's business model.  On May 28, 2014, Valeant hosted a conference call with investors to respond to Allergan's allegations that Valeant's business model was unsustainable.  During the conference call, defendant Pearson boasted that Valeant's operating model was "sustainable for many years to come," and emphasized that Valeant "***has delivered strong organic growth since I have been here,***" is "***very transparent,***" and has a "***basic underlying growth rate [of] about 8%.***"  Defendant Jorn similarly boasted that "***in 2014 we have returned the business to growth,***" highlighting the growth of Valeant's dermatology products, including Solodyn and Acanya®.[15]  Defendant Jorn stated:

> We have stabilized, focused and energized the sales force. We are launching several new brands which I will talk about. ***We have returned many of our core promoted brands to growth***. We have new managed care capabilities, ***we have launched additional access programs so that patients can get the medicines that their physician prescribes for them***.
>
> \*    \*    \*
>
> So what type of growth are we talking about? ***It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn***.  We entered the year with 49% share, branded share of the dermatology space. We are now up at 51% and as you can see,

---

[15] Solodyn and Acanya are Valeant-branded prescription acne medications that were sold through Philidor.

our competitors have issues.  Doryx has been declining and Monodox is flat.  We are very proud of this accomplishment.

Further, *we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya.*  Despite loss in some major accounts in managed care, we have been able to achieve this.

133.   During the question and answer portion of the conference call, analysts focused on price increases.  For instance, Stifel Nicolaus analyst Annabel Samimy pointed out that while industry data showed 15% price increases, slides used during the presentation showed only a 1% increase, and asked defendant Pearson to reconcile these figures.   In response, defendant Pearson claimed Valeant was *"limited"* to "*9%*" price increases in dermatology and denied Allergan's claims that the Company's growth was driven by unsustainable price increases, stating:

So I think most external sources talk about gross prices which have nothing to do with net pricing through managed care contracts, etc., etc. *We are limited.   For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc. So that is what limits. It is managed care in the United States*.

\*   \*   \*

I think we showed that when *we went through the 10 points that Allergan asserted* which was based on just looking at conventional sources and *it is just not applicable to the way we run our business. And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at*.

134.   At the Sanford C. Bernstein Strategic Decisions Conference on May 28, 2014, defendant Pearson continued to emphasize the Company's "focus on volume growth" and deny its reliance on unsustainable price increases, stating:

> The only country in the world that you can really sustainably increase pricing is the United States. ***And in the United States, you're governed by managed care contracts. And the managed care contract – the highest price increase we could take under any managed care contract we have in the US is 9% a year***.
>
> ***So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. So, we focus on volume growth, and the vast majority of our growth on a global basis – and we went through some of that this morning – is volume***.

135.   On June 17, 2014, the Company held a conference call with investors to "correct recent misrepresentations" and "refute recent misleading assertions by Allergan." On the call, defendant Pearson assured investors that Valeant's "business is strong" and its "operating model is both durable and sustainable."   Defendant Pearson also explicitly denied the centrality of unsustainable price increases to Valeant's business model, stating:

> We have been and we've been doing things the right way and that's going to come to light.   So I think that's – so while there's some opportunity cost, on the flip side, people are really going to see how well our business, our underlying business is doing.  I think that's a really good thing.
>
> *   *   *
>
> I think the other thing we will probably start doing again is price volume. ***People – a lot of assertions are that it's all about price, but it's not***. If you think about first of all, most geographies in the world

- 78 -

you can't raise price. You're just not allowed to and – in terms of pharmaceutical products. And also given our mix, we have about 25% of our products are OTC, and there's limited price increase there. About 25% are devices, things like contact lenses where we're not raising price.

So I think what we're talking about earlier this morning is ***probably we will report what the volume and price parts of our organic growth are. And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is.***

136.   On July 31, 2014, Valeant issued a press release announcing its financial results for the second quarter ended June 30, 2014.  In the press release, the Company reported "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year." The press release quoted defendant Pearson as stating: "***Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter***. … As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

137.   Later that day, the Company hosted an earnings conference call with analysts and investors to discuss its second quarter 2014 financial results.  During the call, defendant Pearson discussed Valeant's growth, particularly in dermatology, stating:

> ***Turning to medical dermatology*** ... [t]he business has now stabilized, with a new management team. ***And the branded market share has increased across all key Medicis products since the beginning of 2014. This includes Solodyn, Ziana, and Zyclara***.

- 79 -

\* \* \*

Moving to our performance by business. I would like to touch on the growth and performance of our developed market operations, excluding the Bausch & Lomb businesses. ***In the US, dermatology grew approximately 7% in the quarter,*** including the headwinds from generics***, driven by the continued growth of Acanya, Targretin, and Elidel***.

\* \* \*

***Given the strong reception from both physicians and patients of our recently launched products Jublia***, Ultra, and Luzu, each of them has exceeded our expectations. As I mentioned, ***after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts. This trend is expected to accelerate, as*** regulatory approval for marketing materials are received and ***our dermatology sales forces is appropriately trained***.

138.   During the question and answer portion of the call, analysts sought additional information about Valeant's alternative fulfillment initiative. While defendants' refused to provide substantive details, defendant Pearson assured analysts that Valeant's AF program was "very successful." For example, in response to a question from Deutsche Bank analyst Greg Fraser "on the alternative fulfillment initiatives" and whether Valeant could provide "a sense of how much volume tends to run through that channel," defendant Pearson stated:

***We're not going to give specifics. It's – we think it's a competitive advantage that we have.*** And it is still primarily the Medicis products, although not exclusively the Medicis products. ***And – but I don't want to give specific numbers, but it is a very successful initiative***.

139.   On August 1, 2014, Valeant filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014 (the "Q2 2014 Form 10-Q"), which reaffirmed the Company's financial results previously announced.  The Q2 2014 Form 10-Q was signed and certified as accurate by defendants Pearson and Schiller.  Among other things, the Q2 2014 Form 10-Q highlighted the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

140.   On August 19, 2014, in response to statements made by Allergan in an August 5, 2014 press release and in an August 15, 2014 *Financial Times* article, the Company filed a "[c]larification on assertions made about Valeant's business" with the SEC.  In the filing, Valeant assured investors and the broader market that the Company's "*Promoted Pharmaceutical brands (i.e., Dermatology, Dental) are growing from a combination of price and volume*" and that Valeant has *"no knowledge of any exposures or issues other than those disclosed or for which reserves have been established*."

141.   On September 11, 2014, the Company filed with the SEC a letter defendant Pearson sent to Valeant employees concerning Allergan's "attack[s]" on Valeant's "business model and … track record of organic growth." In the letter, defendant Pearson pointed out "[h]ighlights across Valeant's businesses," including:

(i) "*return to growth of [Valeant's] U.S. Prescription Dermatology business,* including the Obagi Medical business**, coupled with the early, but exciting launch successes of Jublia and Luzu"**; and (ii) **"continued tremendous growth in [Valeant's] U.S. Neuro & Other and OraPharma businesses."**

142.   On October 20, 2014, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2014.  The press release reported **"[t]otal [r]evenue [of] $2.1 billion ... GAAP EPS [of] $0.81, [c]ash EPS $2.11,"** and net income of $275.4 million.  The press release also highlighted that **"[t]otal same store sales organic growth was 19%,** including impact from generics."

143.   The same day, the Company held an earnings conference call with analysts and investors to discuss its third quarter 2014 financial results.  On the call, defendant Pearson highlighted improved marketing and increased dermatology sales as the key drivers of Valeant's earnings growth, stating:

> **Revenues for our dermatology business,** including the recent Precision acquisition**, grew 33% quarter over quarter. The turnaround of our dermatology business is continuing. New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well. This has resulted in market share and revenue gains across the portfolio, including launch products**.
>
> **Elidel, Acanya, Zyclara, and Ziana have all gained market share since the beginning of 2014. Elidel has had an exceptional year, increasing market share from 45% to 52%.** And it has overtaken Protopic as the leader in this category.
>
> **After years of declines Solodyn market share has stabilized. On the new products side, both Jublia and Luzu quickly gained share, with**

*Jublia reaching 7% script share of the total onychomycosis market, both branded and generics. And Luzu accelerated its script share to 13% of the branded topical antifungal market. In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%.*

144.   On October 20, 2014, Allergan filed a response to Valeant's third quarter 2014 financial results with the SEC, wherein it asserted that "price is a large driver of growth for select Valeant U.S. pharmaceutical businesses."   In response, Valeant filed a document titled "October 20th rebuttal items," which stated:

- *Overall price/volume for the Valeant business was ~50% volume and ~50% price.*

- *Like all PhRMA* [Pharmaceutical Research and Manufacturers of America] *companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.*

- *Gross price increases could be seen as higher but do not contribute to our reported net sales growth.*

145.   On October 24, 2014, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2014 (the "Q3 2014 Form 10-Q").  The Q3 2014 Form 10-Q was signed and certified as accurate pursuant to SOX by defendants Pearson and Schiller.   The Q3 2014 Form 10-Q reported revenue of $2.056 billion, net income of $275.4 million, and GAAP EPS of $0.81 and highlighted the Company's purportedly lower risk business strategy, stating:

*The growth of our business is further augmented through our lower risk research and development model, which allows us to advance*

*certain development programs to drive future commercial growth, while minimizing our research and development expense.* We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

146.   On January 8, 2015, the Company held a conference call with analysts and investors to discuss its expected financial performance and strategic initiatives for fiscal year 2015.   During the call, defendant Pearson boasted that Valeant's "tremendous organic growth improvement in 2014," was a testament to the sustainability of the Company's business model.   In particular, defendant Pearson stated:

> *We demonstrated tremendous organic growth improvement in 2014*....

> \*   \*   \*

> In conclusion, *all the successes from 2014* and our [process] for 2015 and beyond *continue to validate that Valeant's business model is both sustainable and value creating. Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014* and 2015 but strong organic growth for the foreseeable future.

147.   On February 22, 2015, the Company issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2014.   In the press release, Valeant reported "[r]evenue [of] $2.3 billion ... GAAP EPS [of] $1.56, Cash EPS [of] $2.58 (excluding Allergan gain)," and net income of $534.9 million for the fourth quarter, and "*[r]evenue [of] $8.3 billion ... GAAP EPS [of] $2.67, Cash EPS [of] $8.34,* (excluding Allergan gain),"

and net income of $913.5 million for full year 2014.  The press release highlighted total same store sales organic growth of 16% and 13% for fourth quarter and fiscal year 2014, respectively.  Additionally, the press release quoted Pearson as touting the Company's "*[o]utstanding growth in the U.S., most notably dermatology"* and boasting that Valeant's focus on *"strong organic growth"* "is paying off for all of [Valeant's] stakeholders."

148.   On February 23, 2015, the Company held an earnings conference call with analysts and investors to discuss its fourth quarter and full year 2014 financial results.  On the call, defendant Schiller highlighted Valeant's sources of growth, emphasizing that *"[r]revenues for [Valeant's] dermatology business were very strong and increased 70% year-over-year.*"  Defendant Schiller further cited "innovative marketing approaches" and "a portfolio of great products" as contributing factors to the Company's "outstanding results in [Valeant's] dermatology business," stating:

> *The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014*.
>
> *Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013*.
>
> *Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report*. This

yields an annualized run rate of greater than $250 million for the product.

149.   On February 25, 2015, Valeant filed its Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fourth quarter and year ended December 31, 2014 (the "2014 Form 10-K"), which reaffirmed the Company's financial results previously announced.  The 2014 Form 10-K also included statements touting the Company's supposedly "lower risk" business strategy.  For example, the 2014 Form 10-K stated: ***"The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.***"

150.   The 2014 Form 10-K also claimed that the Company competes in the market by demonstrating the "medical benefits" and "cost advantages" of its products, stating: "***To successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care.***"

151.   In addition, the 2014 Form 10-K contained statements about Valeant's VIEs, while omitting any mention of Philidor.  In particular, the 2014 Form 10-K represented that "***[t]he consolidated financial statements include the accounts of***

- 86 -

*the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary*." The 2014 Form 10-K also included a section titled "Business Combinations" wherein Valeant stated that "*[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate*.  These acquisitions are included in the aggregated amounts presented below."[16]

152.   The 2014 Form 10-K included "Reports of Management on Financial Statements and Internal Control over Financial Reporting," which stated:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, ***management selects appropriate accounting policies*** and uses its judgment and best estimates ***to report events and transactions as they occur***. ***Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.***

\*   \*   \*

---

[16] These statements were repeated in Valeant's filings for the first and second quarters of 2015.  In each of these filings, the Company failed to identify Philidor as a material consolidated VIE and make the required disclosures under ASC Topic 810.

**Internal Control Over Financial Reporting**

\*     \*     \*

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014.***

153.   The 2014 Form 10-K was signed by defendants Pearson, Schiller, Ingram, Farmer, Goggins, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben, and certified as accurate pursuant to SOX by defendants Pearson and Schiller.

154.   On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015, and increased revenue guidance for full-year 2015 from a range of $9.2 billion to $9.3 billion to a range of $10.4 billion to $10.6 billion.  The press release reported "***Same Store Sales Organic Growth [of] 15%, driven by***": "***Growth from launch brands,*** including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, ***Jublia, Luzu,*** and Ultra Contact Lens"; and "***Double digit growth in U.S. businesses such as*** Contact Lens, ***Dermatology, Neurology and Other,*** Obagi, and Oral Health."

155.   That same day, the Company held an earnings conference call with analysts and investors to discuss its first quarter 2015 financial results.  During the

call, defendants touted Valeant's growth while continuing to deny the importance of price increases to the Company's year-over-year revenue growth.  For example, defendant Pearson boasted: "*Our US dermatology business had an outstanding quarter.  Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year*."  In response to Goldman Sachs analyst Gary Nachman's question about price versus volume growth, defendant Pearson assured analysts and investors that Valeant was focused on volume growth, stating:

> *In terms of price/volume, actually volume was greater than price in terms of our growth.* Outside the United States it's all volume…. *And in the US it's shifting more to volume than price, and we expect that to continue* with our launch brands.  A lot of our prices, for most of our products, are negotiated with managed care. And there's only a limited amount of price that we can take.  ... *So, it's primarily volume, and we expect that to continue.*

156.   On April 30, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC for the first quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"), reiterating its financial results previously announced.  The Q1 2015 Form 10-Q was signed by defendants Pearson and Schiller and included the same statement related to Valeant's "Business Combinations" as in the 2014 Form 10-K, discussed above, while failing to mention the existence of Philidor as a VIE.  The Q1 2015 Form 10-Q also contained similar statements to those described above highlighting the Company's purportedly lower risk strategy.

157.   On July 23, 2015, Valeant issued a press release announcing its financial and operating results for the second quarter ended May 31, 2015, and increasing its full-year 2015 financial guidance.  For the quarter, Valeant reported that "***Same Store Sales Organic Growth was 19%, driven by: U.S. businesses, driven by the strength of dermatology***, contact lenses, dental and Obagi."  The press release quoted defendant Pearson boasting about Valeant's strong second quarter results:

> *We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth*.  *Our strong second quarter results were driven by outperformance in our U.S. businesses*, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions.

158.   Defendant Pearson reiterated these statements during the Company's July 23, 2015 earnings conference call with analysts and investors, stating:

> *We have now delivered four consecutive quarters of more than 15% same-store organic growth*.  *Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.*

> \*   \*   \*

> *Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter. The exceptional growth of our US businesses driven by the strength of dermatology*, contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.

> \*   \*   \*

> *Jublia is now our second largest product with annual run-rates sales of approximately $450 million*....
>
> *Our US dermatology business had another excellent quarter* with our launch brands leading the way. *Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1....*

159.   During the question and answer portion of the conference call, in response to an analyst's question about the "extent to which [Valeant] envision[s] more pricing power," defendant Pearson reiterated that the Company was focused on organic growth through volume increases,  stating:

> *Our view on pricing* -- across most of our portfolio, *we do not take prices*. Outside the US, there's like zero price.  I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. *But our base strategy is, how do we grow organically through volume, which is -- I think this quarter, we once again exhibited our ability to do so*.

160.   On July 28, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC for the second quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), reiterating its financial results previously announced.  The Q2 2015 Form 10-Q was signed and certified as accurate by defendants Pearson and Rosiello.  The Q2 2015 Form 10-Q reported the Company's revenues for the six months ended June 30, 2015 of $4.92 billion and stated:

> *As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and

include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers....

***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015,*** respectively, compared with 27% and 26% in the second quarter and first half of 2014. ***The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%")***.

## <u>REASONS THE STATEMENTS WERE IMPROPER</u>

161.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   Valeant engaged in a number of unlawful and deceptive business practices that inflated its reported financial metrics;

(b)   the source of Valeant's growth was not improved marketing, business strategies, and increased sales volume of certain products, but rather the result of the deceptive business practices detailed herein;

(c)   Valeant's business strategy was not sustainable and exposed the Company to increased risks, including the increased threat of regulatory sanctions, increased costs of investigations, reputational harm, decreased sales, and increased regulatory scrutiny;

(d)     Philidor was not independent, but had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and prevent the substitution of Valeant-branded products with generic equivalents;

(e)     Valeant lacked adequate internal controls over accounting and financial reporting;

(f)     Valeant failed to employ proper compliance measures to ensure appropriate accounting practices;

(g)     Valeant was improperly recognizing revenue that had not yet been realized in violation of GAAP;

(h)     Valeant's financial statements overstated the Company's revenue and earnings;

(i)     Valeant failed to maintain proper corporate governance to prevent manipulation of revenue recognition and ensure compliance with its disclosure obligations; and

(j)     as a result of the foregoing, defendants' representations concerning Valeant's business, operations, financial condition, and compliance policies were improper.

## THE TRUTH ABOUT VALEANT'S UNLAWFUL BUSINESS PRACTICES GRADUALLY EMERGES WHILE DEFENDANTS <u>CONTINUE TO MISLEAD THE MARKET</u>

**Media Outlets Reveal Valeant's Unlawful Price Gouging Practices**

162. The truth behind Valeant's business practices and Individual Defendants' wrongdoing began to emerge on September 28, 2015, when *Bloomberg* published an article reporting that members of Congress were calling for an investigation into price-gouging by Valeant.   *Bloomberg* reported that all Democratic members of the U.S. House of Representatives Committee on Oversight and Government Reform (the "House Oversighting Committee") had sent a letter to Chairman Jason Chaffetz to subpoena Valeant for documents related to "massive price increases" for two heart medications.  In the letter, U.S. Representatives wrote:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm. The same day, Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%). When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

163.   The House Oversight Committee letter also revealed that earlier in the year, on July 31, 2015, staff members from the House Oversight Committee had a call with Valeant representatives wherein Valeant "failed to adequately answer … questions about the basis for their skyrocketing prices."  Further, according to the letter, on August 12, 2015, "Ranking Member [Elijah E.] Cummings sent [a]

document request to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

164.   In addition, that same day, the *Washington Post* reported that U.S. Senator Claire McCaskill "sent a detailed list of 22 questions to [Valeant], probing its simple explanation that it increased two heart drug prices because they were 'significantly underpriced.'"  Further, the following day, September 29, 2015, media outlets reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice of buying old neglected drugs and needlessly turning them into high-price specialty drugs.

165.   Valeant denied these allegations.  On September 28, 2015, Valeant filed a Current Report on Form 8-K with the SEC attaching a letter from defendant Pearson to the Company's employees responding to claims that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."   In his letter, defendant Pearson referred to these concerns as a "bear thesis," claimed they were "*incorrect on both accounts*," and dismissed the allegations that the Company was dependent on price increases stating "*Valeant is well-positioned for strong organic growth, even assuming little to no price increases*."   Defendant Pearson explained that "*Valeant's core operating*

*principles include a focus on volume growth"* and reiterated that "the majority of [Valeant's] portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases.*"   Defendant Pearson pointed out that growth in dermatology, ophthalmology Rx, and dentistry Rx was based on having "*delivered over 30% script growth year to date*," and that Valeant expected "*double-digit script growth and corresponding revenue growth trends to continue*" in the Salix business and "*double-digit organic growth in 2016 and beyond."*  Defendant Pearson concluded by noting that it was "not the first time [Valeant] faced questions about [its] business model and strategy in the market, and it likely won't be the last."

166.   Notwithstanding defendant Pearson's attempts to reassure analysts and investors, when the allegations of deceptive pricing practices at Valeant reached the market, the price of Valeant's stock dropped more than 20%, from a close of $199.47 per share on September 25, 2015, to close at $158.08 per share on September 29, 2015, eliminating over *$14 billion* in market capitalization in two trading days.

167.  On October 4, 2015, the *New York Times* published an article questioning defendant Pearson's representations that Valeant was "well positioned for strong organic growth," even without price increases.  The article highlighted Valeant's dependency on price gouging, stating: "Analysts at Morgan Stanley estimated that 'outsized' price increases on eight drugs accounted for about 7 percent of Valeant's revenue and 13 percent of its earnings before taxes and interest in the

second quarter."  The article also compared Valeant's pricing practices to industry practices, explaining that in 2015 alone, "Valeant raised prices on its brand-name drugs an average of 66 percent ... about five times as much as its closest industry peers."  As an example, the article cited Glumetza, a diabetes pill, which Valeant had increased the price of by over 800% during the year, with a monthly supply increasing from roughly $500 to $4,600.

168.  Then, on October 14, 2015, the Company issued a press release revealing that it had "recently received" subpoenas from both the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York. Valeant disclosed that the subpoenas sought documents concerning Valeant's PAPs, Valeant's pricing decisions, distribution of Valeant's products, and financial support Valeant provided for its patients.  In the press release, Valeant attempted to soften the alarming disclosures by assuring investors that "[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."  The press release also noted that Valeant "responded to a letter from Senator Claire McCaskill" regarding the pricing and "reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions."

169.  Notwithstanding these assurances, the following day, October 15, 2015, media outlets reported that Valeant was failing to fully cooperate with the

Congressional inquiries into Valeant's price-gouging practices. In particular, various media outlets reported Senator McCaskill's comment that Valeant was being "anything but responsive or transparent," and "it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

**Media Outlets Reveal Valeant's Network of Phantom Captive Pharmacies After the Company Is Forced to Partially Disclose Its Secret Relationship with Philidor**

170.   Additional details about the Company's deceptive business practices began to emerge on October 19, 2015, when Valeant issued a press release announcing its financial results for the third quarter of 2015 and hosted an earnings conference call in connection with these results. During the call, the Company disclosed its relationship with, and option to acquire, Philidor, and that it had been consolidating Philidor's financial results with its own. In addition, the Company disclosed that it would reduce reliance on acquisitions and focus more on R&D, effectively admitting that its nontraditional strategy was neither sustainable nor less risky. Specifically, the Company disclosed that pricing amounted to roughly 60% of its growth in 2014 and 2015, and defendant Pearson stated that Valeant would be "making pricing a smaller part of [their] growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products." Defendant

Pearson also noted that Valeant was "seriously considering spinning off or selling" its "Neuro and Other portfolio, which is dependent on price."

171.    Notwithstanding these partial disclosures, the Company continued to mislead the market.    For instance, defendant Pearson claimed that Valeant's relationship with Philidor had not been disclosed previously for "*competitive*" reasons and suggested that Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices.    In particular, defendant Pearson stated:

> *The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions* by some, we will provide an update to this call.
>
> *Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled*.

172.    Additionally, with respect to Valeant's revenue recognition practices for products sold through Philidor, defendant Pearson misleadingly stated: "*Since we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue*

*recognition as compared to products that are sold through traditional distribution*

*channels*."

173.   During the question and answer portion of the conference call, when asked what percentage of U.S.-branded prescription business flowed through "alternat[ive] fulfillment" and "how much of that is Philidor," defendant Pearson responded:

> Sure. It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin, and some of the other orphan drugs. For certain products it's quite large. For Jublia it's probably 15%. For a lot of other dermatologies it's much less. I'm sorry, I can't – it's significant but it's – I don't know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe. Tanya's nodding probably closer to 10%.

174.   Later that same day, October 19, 2015, the *New York Times* reported that Philidor's application for a license in California had been rejected because it had concealed its owners.  The article, titled "Drug Makers Sidestep Barriers on Pricing," explained how Valeant used Philidor to "keep the health system paying for high-priced drugs" and to charge exorbitant prices for its dermatology products.  The article quoted a Florida dermatologist as stating that Valeant's program was designed to buffer physicians and insurers from complaints about high prices.  In particular, the article stated:

> Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor

late last year. He said that Valeant consolidated Philidor's results in its own financial reports.

*    *    *

Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by ... Valeant are for common ailments like arthritis pain, acne, and toenail fungus.

175.   The news continued to worsen on October 21, 2015, when more details emerged about the mechanism by which Valeant maintained its price increases.  In a report titled "Valeant: Could This Be the Pharmaceutical Enron?," published that day, *Citron Research* questioned why Valeant would "be secretly maneuvering to buy a little known pharmacy [Philidor] with a dubious ownership structure" and why this entity was "NEVER disclosed in any prior company disclosure?"  The *Citron Research* report alleged that Valeant was using an "entire network of phantom captive pharmacies," that included West Wilshire Pharmacy and Orbit, to artificially boost Valeant's revenue and maintain sales volume despite massive price increases. The *Citron Research* report also called into question the independence of Philidor by revealing that Philidor was linked to other pharmacies through shared phone numbers, identical privacy notices, a shared facsimile number, and shared websites. In addition, the *Citron Research* report disclosed details of the R&O lawsuit, including allegations that Valeant was "conspiring … to perpetuate a massive fraud."

176.   In response to these allegations, after the market closed on October 21, 2015, Philidor issued a press release confirming its contractual relationships with "affiliated pharmacies," including R&O, and stating that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

177.   Following these revelations, on October 22, 2015, BMO Capital Markets Corp. downgraded Valeant shares to "market perform," stating that it "cannot defend the specialty Pharmacy structure….   [W]e find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."

178.   Also on October 22, 2015, *Bloomberg* reported on Valeant's option to buy Philidor, noting that it was "a relationship other [drug] companies don't appear to have" with pharmacies.  The article, titled "Valeant Still Has Explaining to Do, Citron's Left Says," noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because it was "perceived" to be a conflict of interest.

179.   In the days following these revelations, Valeant's stock price fell nearly 40%, from a close of $177.56 per share on October 16, 2015, to close at $109.87 per share on October 22, 2015, erasing more than *$23 billion* in market capitalization.

180.   Only days later, Philidor employees revealed the deceptive business practices being used by Philidor to sell overpriced Valeant pharmaceuticals.   On October 25, 2015, the *Wall Street Journal* published an article detailing interviews with former Philidor employees about Valeant's relationship with Philidor.   The article, titled "Valeant and Pharmacy More Intertwined than Thought," reported that Valeant employees were working directly at Philidor under aliases to conceal the relationship between the two companies "so it didn't appear Valeant was using the pharmacy to steer patients" to Valeant products.   The article specifically mentioned Patel, whose LinkedIn page identified him as a Manager of Access Solutions at Valeant, but who actually worked out of Philidor's Phoenix-area office and sent e-mails to Philidor employees using the fictitious name "Peter Parker."   These e-mails detailed how many prescriptions Philidor was filling, which drugs were most popular, and what doctors were the biggest prescribers.   The article stated:

> Interviews with former employees, doctors who prescribe Valeant drugs and patients indicate that the ties between Valeant and Philidor are more interconnected than previously disclosed. ***The people gave details of how the companies worked together, with Valeant employees working directly in Philidor offices, sometimes using fictional names. The people said this was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products***, which Philidor strongly denied.

181.   The following day, October 26, 2015, before the market opened, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q").   In the Q3 2015 Form 10-

Q, the Company admitted that Valeant possessed "the power to direct Philidor's activities" and stated that the entire Board had reviewed Valeant's accounting for Philidor and confirmed its appropriateness.  In particular, the Q3 2015 Form 10-Q stated:

> During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, ***which were not material individually or in the aggregate.*** These acquisitions are included in the aggregated amounts presented below. Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC. The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits. As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements. Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015. The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.

> \*   \*   \*

> On October 26, 2015, the Company also announced that its ***Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.***

182.   The Q3 Form 2015 10-Q also revealed that the Company had created a special "Ad Hoc" committee of the Board to conduct an internal investigation into

- 104 -

the Company's relationship with Philidor.  The Ad Hoc Committee was led by defendant Ingram and included defendants Provencio, Goggins, and Morfit.

183.   Later that day, the Company held an investor update conference call with investors and analysts.  On the conference call, defendant Rosiello disclosed Philidor's status as a VIE, and stated: "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014."  Also during the call, defendant Carro admitted that "Valeant reviews the financials of the Philidor network pharmacies on a regular basis."

184.   A presentation included with the conference call disclosed additional information about the Company's relationship with Philidor.  In the presentation, Valeant acknowledged that it "maintain[s] regular communication, ha[s] a joint steering committee, [has] rights (and [has] utilized them) to approve key positions (e.g., in-house lawyer, chief compliance officer), includ[ing] Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit Program for 2015."   In addition, the presentation stated that "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, … substantial information rights, Covenants respecting Philidor's compliance with all applicable laws," and that Valeant had "Management Rights" over Philidor which included the right "to appoint or cause

Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, [and] Other employees as reasonably requested." The presentation also discussed Valeant's reliance on Philidor.  For example, the presentation noted that "44% of Jublia revenue flowed through Philidor in Q3 2015."

185.  Despite these admissions, during the conference call, Valeant's fiduciaries continued to misrepresent the Company's relationship with Philidor, downplay the importance of Philidor to Valeant's consistent revenue growth, and deny accounting improprieties at Philidor.  In the presentation issued in connection with Valeant's October 26, 2015 conference call, Valeant represented that: (i) "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates, and more cash pay scripts in Philidor than in retail and other channels"; (ii) "Philidor employees do not report to Valeant…"; (iii) "Philidor is independent…"; (iv) "Unless and until Valeant exercises the option to acquire Philidor, Philidor remains independent and Valeant has no rights to remove [its] CEO or management"; and (v) "There have been no issues with regard to the accounting or revenue recognition of the business."

186.  During Valeant's conference call with analysts and investors, defendants Pearson and Ingram repeatedly assured investors that there were no accounting improprieties involving Philidor.  For instance, defendant Pearson stated: "We still believe that the strategy of working with specialty pharmacies is sound and

it's good for patients and physicians.  ***There have been no issues with regards to the accounting or revenue recognition of the business***"; and "***We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor***."  Defendant Ingram echoed these assertions, stating: "[T]he Company stands by its accounting completely.  The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment."

187.   Defendant Rosiello reinforced these statements, adding: (i) "Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate"; (ii) "***Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price***"; (iii) "***There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients***"; and (iv) "***Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.***  A purchase option agreement for Philidor was executed in December 2014.  The finance and transactions committee, audit and risk committee, and full

Board, all reviewed the transaction.   The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

188.   Defendant Carro also defended Valeant's accounting practices and its failure to previously disclose its relationship with Philidor.  According to defendant Carro, as of December 31, 2014, "***Philidor is not considered to be material to Valeant's business for reporting purposes***" because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were only $111 million.  Defendant Carro further stated that for the first two quarters of 2015, "***Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements***," because "***[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014***."

189.   While defendant Pearson attempted to mitigate the impact of the negative news, by endorsing the Company's previously released 2016 earnings guidance, a *Bloomberg* report published later that day, on October 26, 2015, noted that the defendants' remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor."

**Valeant Discloses that the Deceptive Business Practices Require Philidor's Closure**

190.   Not long after the partial disclosures detailed above, media outlets revealed the deceptive tactics Valeant employed to increase sales despite sustained

price increases.  On October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to increase payments and expressly "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted."

191.  Then, on October 29, 2015, *Bloomberg* published another article reporting on additional accounts by former Philidor employees of the improper tactics at Philidor.  According to the article, former Philidor employees reported that in order "to fill more prescriptions with Valeant products instead of generics," "[w]orkers at ... Philidor ... were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs – not less expensive generic versions – be dispensed."  The article further reported that "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels ... is rejected."

192.  Also on October 29, 2015, reports emerged that CVS Caremark, Express Scripts, and OptumRx, three of the largest PBMs in the United States, were terminating their relationships with Philidor.

193.   Then, the following day, on October 30, 2015, mere days after touting the purported benefits and independence of Philidor, Valeant announced that it had terminated its relationship with, and was shutting down, Philidor.

194.   In the two days following this news, Valeant's stock price fell nearly 20%, or $23.23 per share, from a close of $117 per share on October 28, 2015, to close at $93.77 per share on October 30, 2015, erasing nearly ***$8 billion in market capitalization***.

195.   Then, on November 4, 2015, before the market opened, media outlets reported that the U.S. Senate had formally launched a probe into Valeant's pricing practices.   Also before the market opened that day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, as it disclosed that, just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy.

196.   After the market closed on November 4, 2015, the *Wall Street Journal* published an article revealing that Ackman of Pershing Square, Valeant's largest stockholder, was seriously considering liquidating his entire $3.8 billion stake in Valeant.   The article also said that Ackman had urged Valeant to hold a conference call to "come clean" and disclose the full extent of its executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

197.   On November 10, 2015, before the market opened, the Company held a conference call with analysts and investors to "update [the market] on [its] strategy

with respect to specialty pharmacies," "explain [its] transition plans for Philidor," and "discuss [its] business performance for the first half of the quarter."  During the conference call, defendant Pearson noted that "Philidor ha[d] stopped adjudicating claims" and "committed to cease operations by January 30, 2016 at the latest," and began to disclose the "significant" negative impact that Philidor's closing and the governmental probes would have on Valeant's business and financial guidance. According to defendant Pearson, the closing of Philidor would have significant "short-term" effects on Valeant's dermatology product lines and the governmental probes were placing "short-term" pressure on the Company's neurology lines. Defendant Pearson added the following in response to a question concerning the impact the Company would see in fourth quarter 2015 in the dermatology division:

> So, again, based on the data we have, we've not seen volume declines. It's largely the value of the average selling price for a script. Now, I would not be shocked to see some volume declines over the next few weeks.
>
> In fact, I would expect that. But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

198.   While Valeant had raised its financial guidance less than a month before, on October 19, 2015, defendant Pearson suggested it would be withdrawn and revised downward.  In particular, defendant Pearson stated:

> Turning to guidance. In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship with Philidor. Specifically, the

downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology Rx. Obviously, what has happened will impact Q4. We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

199.   On November 11, 2015, before the market opened, *Bloomberg* reported that Valeant creditors were "spooked by possibility of revenue squeeze" and that concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." Later that day, while the market was open, Nomura analysts cut their Valeant price target.

200.   On November 12, 2015, before the market opened, *Bloomberg* published another article regarding Valeant's relationship with Philidor, and media outlets reported that analysts at a number of firms had lowered their price targets for Valeant.

201.   Then, on November 16, 2015, *Bloomberg* reported that Congressman Elijah Cummings had requested that defendant Pearson make Valeant employees available for interviews before the House Oversight Committee.   Specifically, Representative Cummings requested that defendant Pearson make Tanner, Patel, and Pritchett available for interviews given the recent allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations."  Later that day, the *Washington Post* reported that the House Oversight Committee had announced it would hold a hearing in early 2016 on

prescription drug pricing, and was gathering information from Valeant in preparation for the hearing.

202.   In the days following this news, Valeant's stock price fell more than 6%, or $5.09 per share, from a close of $75.41 per share on November 13, 2015, to close at $70.32 per share on November 17, 2015, erasing more than ***$1.7 billion in market capitalization***.

**The Financial Impact of the Unlawful Scheme Continues to Emerge**

203.   On December 15, 2015, Valeant issued a press release announcing that it had entered into a deal with Walgreens to distribute its products, and assured investors that the Walgreens partnership was a better option than Philidor.  Notably, in connection with this agreement, Valeant disclosed that it would reduce the price of its branded prescription-based dermatological and ophthalmological products by 10%.  When defendant Pearson was asked on CNBC whether investors should expect the Walgreens partnership to "be the same sort of level of profitability and growth" as Philidor, defendant Pearson assured investors that the Walgreens deal "more than replaces Philidor…."

204.   Despite these assurances, the next day, December 16, 2015, Valeant issued a press release formally withdrawing the financial guidance it had issued less than two months before, on October 19, 2015.  The new guidance entailed the following reductions for the fourth quarter and full year of 2015:  A fourth quarter

2015 revenue reduction from $3.25-$3.45 billion to $2.7-$2.8 billion; a fourth quarter 2015 EPS guidance reduction from $4.00-$4.20 to $2.55-$2.65; a 2015 full year revenue guidance reduction from $11.0-$11.2 billion to $10.4-$10.5 billion; a 2015 full year EPS guidance reduction from $11.67-$11.87 to $10.23-$10.33; and new 2016 earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance reduction from $7.5 billion to $6.9-$7.1 billion. During a conference call held in connection with the revised guidance, defendant Pearson assured analysts and investors that this revised guidance was conservative.

205. The following day, on December 17, 2015, before the market opened, Mizuho Securities USA ("Mizuho") cut its rating on Valeant stock from "buy" to "neutral," pointing to a lack of clarity regarding Valeant's agreement with Walgreens. Mizuho also stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."

206. On December 28, 2015, Valeant announced that defendant Pearson had left the Company, on a medical leave of absence, effective immediately. To fill the gap, Valeant created an "Office of the CEO," which included Chai-Onn and defendants Kellen and Rosiello to serve in an interim capacity, as well as a committee to "oversee and support" the Office of the CEO, which included defendants Ingram, Morfit, and Schiller.

207.   Less than two weeks later, on January 6, 2016, Valeant announced that defendants Schiller and Ingram would serve as interim CEO and interim Chairman of the Board, respectively, while defendant Pearson remained on medical leave.

208.   On February 19, 2016, media outlets commented on a report by Wells Fargo Securities senior analyst David Maris ("Maris") that called into question the accuracy of Valeant's revised guidance.  Maris' report noted that Valeant's "new guidance is not compatible with the data presented by Valeant" concerning Philidor's importance, and argued that Philidor was likely far more important to Valeant's revenue growth than the Company represented to the market.  Maris also noted that "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS."  Maris added that, at approximately 7% of revenue, Philidor would have represented roughly $227.8 million in revenue for the fourth quarter, but guidance was lowered by $526.5 million.

209.   Maris also cited the "significant uncertainty and a lack of clarity regarding the distribution agreement with Walgreens and how it benefits Valeant" as cause for concern.  Maris explained that: "We do not believe Valeant has provided enough detail on the Walgreen's deal to allow an investor to determine the financial impact of the deal.  Our discussion with Walgreens leads us to believe that

Walgreens was in an advantageous position given the timing of the deal."

210.   In addition, under a section titled "Reasons We Are Not Recommending Valeant Shares," Maris cited "serious issues" with the Board and governance.  Maris noted that "investors are likely questioning the judgement and decision making of [the] management team and board," and attributed the decline in Valeant's stock price to "decisions that the Board and management have made," including "the Medicis deal," "the failed hostile bid for Allergan," and "the establishment of Philidor."

211.   As additional reasons Wells Fargo was not recommending Valeant shares, Maris explained that "[w]e remain unclear on several business and accounting-related factors" and "Management seems unable to answer key questions on guidance and other items."  With respect to Valeant's accounting issues, Maris stated that the Company's accounting was misaligned with its reported performance, and noted that "receivables growth has outstripped sales growth over the past several years."  Maris reported that "Valeant does not screen well on certain liquidity and accounting risk screens," and stated that a screening tool Wells Fargo uses "to predict the likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category."  Maris added that Valeant's "receivables growth has outstripped sales growth over the past several years," and explained that when "receivables are increasing faster than revenue, it can often indicate that customers are hesitant to pay

for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue."

212.   On this news, Valeant's stock price fell nearly 10%, to close at $84.99 per share on February 19, 2016, from the previous day's close of $94.11 per share, erasing more than $3 billion in market capitalization.

**Valeant's Improper Accounting Practices Are Revealed**

213.   On February 22, 2016, after the market closed, *MarketWatch* reported that Valeant would likely need to restate its 2014 and 2015 financial results due to discoveries from an internal audit of its financials.   The report noted that the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

214.   As analysts predicted, later that evening, the Company issued a press release admitting that it had improperly recognized revenue for shipments to Philidor.   In the press release, titled "Valeant Ad Hoc Committee has Made Substantial Progress in Its Review of Philidor and Related Accounting Matters," the Company revealed that it had "identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor."   The press release further stated that "approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been

recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10…."

215.  In addition, Valeant announced that it would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee … and the Company's ongoing assessment of the impact on financial reporting and internal controls."  Defendant Schiller confirmed Valeant's internal control issues, admitting that the Company had "made mistakes" and would be "improving reporting procedures, internal controls and transparency for our investors."

216.  On February 28, 2016, Valeant issued a press release announcing defendant Pearson's return as CEO, defendant Ingram's appointment as Chairman of the Board, and the cancellation of a conference call scheduled for the following day concerning Valeant's preliminary fourth quarter 2015 financial results and 2016 guidance.  Valeant also officially withdrew its prior financial guidance and confirmed the delay in filing its 2015 Annual Report pending the Ad Hoc Committee's accounting review.  In the press release defendant Pearson is quoted as stating that "improving Valeant's reporting procedures, internal controls and transparency" would be among his priorities.

217.   On this news, Valeant's stock price fell more than 18%, or $14.85 per share, to close at $65.80 per share on February 29, 2016, erasing more than *$5 billion in market capitalization.*

218.   On February 29, 2016, *Bloomberg* reported that although Valeant's scheduled earnings call was canceled, the Company was "hold[ing] a call for sell-side analysts later Monday that will include Pearson." The call was not publicly announced.  That same day, *Moody's* reported that it had placed Valeant's corporate credit ratings "under review for downgrade," due to "concerns that Valeant's underlying operating performance is weaker than Moody's previous expectations, potentially impeding the company's deleveraging plans."  Then, only hours after *Bloomberg* reported on Valeant's nonpublic conference call, the call was canceled as a result of "media interest."  Later that day, Valeant announced that it was under investigation by the SEC and had received a subpoena during the fourth quarter of 2015.

219.   On March 10, 2016, *Bloomberg* reported that defendant Pearson held a meeting with certain Valeant employees at Valeant's U.S. headquarters in Bridgewater, New Jersey.  According to the article, titled "Valeant CEO, Learning to Walk Again, Lays Out Plans to Top Staff," during defendant Pearson's private meeting, he stated: "We're under a barrage of external government and media and everything else…. Everyone is nervous.  The board is nervous."

220.   On March 15, 2016, before the market opened, Valeant released its preliminary unaudited financial results for the fourth quarter of 2015 and significantly reduced its financial guidance for 2016.  The Company slashed its 2016 revenue guidance by $1.5 billion, from $12.5-$12.7 billion to $11.0-$11.2 billion, lowered its EPS guidance from $13.25-$13.75 to $9.50-$10.50, and cut its EBITDA guidance from $6.9-$7.1 billion to $5.6-$5.8 billion.   As the drivers of these significant downward revisions, Valeant cited "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."  The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses," and a $79 million impairment charge related to Philidor.

221. Defendants Pearson, Rosiello, and Kellen provided additional information about the dismal financial results and reduced guidance during an earnings conference call with analysts and investors held later that day.  On the call, defendant Pearson acknowledged that Valeant had reduced guidance "due to the higher-than-expected inventory reductions that transition from Philidor to Walgreens and the cancellation of almost all price increases."  Defendant Pearson also confirmed the Company's heavy reliance on price increases, stating that "any

future price increases will be more modest and in line with industry practices and managed-care contracts. We have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia...." In addition, defendant Pearson noted that Valeant had "already committed to reducing pricing" on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on [wholesaler acquisition cost] and will impact and will be taken across all channels, not just Walgreens."

222. Further, on the call, Valeant revealed that its press release issued earlier that day had overstated the Company's financial guidance. After an analyst pointed out that the slide deck accompanying the conference call forecast only $6 billion of adjusted EBITDA for the next four quarters while the press release provided guidance of $6.2-$6.6 billion for the same metric, defendant Rosiello admitted that the press release was wrong and should have only forecast guidance of $6 billion.

223. During the question and answer portion of the conference call analysts noted that Valeant's guidance was "lowered far more than any investor anticipated" and highlighted "management['s] need[] to rebuild credibility with investors." One analyst questioned, "how can we be confident in what you're saying today about the business, given that you were positive in December and January?" In response,

defendant Pearson acknowledged that Valeant would "have to earn back the credibility."

224.   When news of the Company's dismal financial results and significantly reduced guidance reached the market, Valeant's stock plunged more than 50%, or $35.53 per share, to close at $33.51 per share on March 15, 2016, from a previous close of $69.04 per share on March 14, 2016, erasing more than *$12 billion* in market capitalization.

225.   On March 21, 2016, the Company filed a Current Report on Form 8-K with the SEC, announcing the restatement of its prior financial statements.   The Form 8-K disclosed that the Ad Hoc Committee's review had determined that "approximately $58 million in net revenue relating to the sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor."   The Company's fiduciaries advised investors that as a result of this determination, the Company's last four financial statements, the 2014 Form 10-K, and the Q1, Q2, and Q3 2015 Forms 10-Q, could no longer be relied upon.

226.   The Form 8-K detailed the Ad Hoc Committee's findings concerning Valeant's accounting practices.   In particular, the Ad Hoc Committee concluded that Valeant's revenue recognition "on a sell-in basis (i.e., recorded when the Company delivered product to Philidor)" prior to Valeant's acquisition of the Philidor purchase option was improper.   The Form 8-K explained that "revenue for certain transactions

should have been recognized on a sell-through basis (i.e., record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement." As a result, the Company was required to record revenues upon shipment to the patient, rather than shipment to Philidor.

227.   In addition, in its March 21, 2016 Form 8-K, the Company admitted that its disclosure controls and internal controls over financial reporting were inadequate.   Specifically, the Form 8-K stated that "one or more material weaknesses" existed in the Company's internal control over financial reporting, and "as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015."

228.   The Company also admitted that its fiduciaries are responsible for the improper accounting practices detailed herein.   According to the Company, the improper revenue recognition practices were the result of "improper conduct" on the part of defendants Schiller and Carro.  The Company further cited the unethical "tone at the top" perpetuated by senior management as a "contributing factor[]" to the Company's ineffective controls over financial reporting.  In particular, Valeant's Form 8-K stated:

> As part of this assessment of internal control over financial reporting, the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition and the conduct described above.

229.   In a press release issued that same day, March 21, 2016, Valeant announced that it had initiated a search for a candidate to succeed defendant Pearson as CEO, and that defendant Pearson would be resigning as CEO and a director once his replacement was appointed.  The press release also stated that defendant Schiller had been asked to leave the Board, but had refused.

230.   On March 22, 2016, *Business Insider* reviewed an analysis done by *Bloomberg* and attempted to quantify the impact of Valeant's change in business strategy from a nontraditional approach to that of a traditional pharmaceutical company. The article, titled "Bill Ackman's Plan to Fix Valeant Is Doomed," noted that without price hikes, "Valeant would lose 10% of its revenue" and operating margins would decrease from 24% to 7%.  Coupled with an increase in R&D spending from 3% to 13%, "Valeant would be losing money.  *A lot of money*." Based on the analysis, the article concluded that:

> If Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12-month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53. Ebit could have dropped to $606 million from $2.5 billion.…  Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million. As the

company focuses on paying down debt and can no longer use price increases, earnings may see a similar effect in future quarters.

231.   On March 28, 2016, news outlets reported that defendant Pearson was called to testify before a senate panel investigate the cost of prescription pharmaceuticals.   For instance, in an article titled "Valeant CEO Subpoenaed to Testify Before U.S. Senate Panel, *Reuters* reported:

> U.S. prosecutors in Massachusetts and Manhattan are probing Valeant's pricing and distribution channels, while the Securities and Exchange Commission is investigating its accounting and disclosure issues.
>
> The Senate committee is one of two congressional bodies that are looking into aggressive prescription drug pricing.
>
> Both committees are particularly focused on Valeant….

232.   On this news, Valeant's stock fell 7.17%, or $2.23 per share, from a close of $31.09 per share on March 24, 2016, to a close of $28.86 per share on March 28, 2016, erasing more than $765 million in market capitalization.

233.   On April 9, 2016, the *New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction." Citing interviews with former employees, analysts, investors, and doctors, the article detailed "how a series of missteps after the deal, along with turbulence from aggressive accounting practices, unusual business relationships and big egos, derailed one of the most intriguing new pharmaceuticals in a generation." According to the article, after Valeant acquired Sprout along with its blockbuster drug Addyi in August 2015,

- 125 -

Valeant doubled the price of Addyi to $800 and terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor. Insurance companies balked at the price increase and refused to cover Addyi at the $800 price. Distribution of Addyi was also an issue since Valeant had handed over this job to Philidor, which was by then out of business. Due to Valeant's pricing actions and reliance on Philidor, as of February 2016, "[d]octors had prescribed the drug fewer than 4,000 times."

234. On April 29, 2016, Valeant announced that seven of its Board members would not be standing for reelection. This included defendants Pearson, Schiller, Farmer, Goggins, Melas-Kyriazi, Morfit, and Provencio. Notably, defendant Provencio was Chairman of the Audit and Risk Committee, defendant Melas-Kyriazi was a member of the Audit and Risk Committee, and defendants Provencio, Goggins, and Morfit were members of the Ad Hoc Committee.

235. Also on April 29, 2016, Valeant filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), confirming the Company's material weaknesses and restatement of its financial statements. The 2015 Form 10-K further revealed the inadequacy of the disclosures in the Company's previously issued financial reports. For example, the 2015 Form 10-K stated that while the Company historically depended on acquisitions, the volume and size of acquisitions in 2016 and beyond was expected to be minimal

which "could have a material adverse effect on [its] business, financial condition, cash flows and results of operations and could cause the market value of [Valeant's] common shares and/or debt securities to decline."

236.   On May 3, 2016, Valeant announced the appointment of Joseph C. Papa ("Papa") as its CEO and Chairman of the Board.  Three weeks later, on May 23, 2016, during the UBS Global Healthcare Conference, Papa described Valeant as "a great turnaround opportunity" and discussed several challenges he inherited.  Papa acknowledged that Philidor "clearly had some question marks" and admitted that "there were some pricing mistakes that were made." Papa also conceded that there were "some transparency things that [could be] improve[d] on at Valeant." Papa also recognized inadequacies in the Company's internal controls, noting that "there are some functions that we need to put some additional controls" and "there's some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities."

237.   On June 7, 2016, Valeant issued a press release announcing its long-delayed first quarter 2016 financial results that further revealed the extent to which Valeant relied on Philidor and deceptive business practices to boost revenue.  For the first quarter of 2016, the Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 financial guidance, cutting revenue guidance from a range of $11.0-$11.2 billion to a range of $9.9-10.1 billion, adjusted EPS from a

range of $8.50-$9.50 to a range of $6.60-$7.00, and adjusted EBITDA from a range of $5.6-$5.8 billion to a range of $4.80-$4.95 billion.

238.    Despite its repeated representations that Philidor was not critical to the Company's revenue growth, during Valeant's earnings conference call, the Company's executives attributed the dismal financial results and outlook to the loss of Philidor.  For example, defendant Rosiello stated that "[t]he base business in Q1 declined by $289 million, driven by dermatology ... and the transition to Walgreens...."  Defendant Rosiello also acknowledged that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship." Further, despite the Company's prior assurances that the Walgreens partnership "will be the same sort of level of profitability and growth" as Philidor, Papa added that "a significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price."

239.    Following the release of these disappointing results and lowered guidance, Valeant's stock price fell nearly 15%, or $4.21 per share, to close at $24.64 per share on June 7, 2016, from a previous close of $28.85 per share on June 6, 2016, erasing more than ***$1.44 billion*** in market capitalization.

240.   Since the truth about Valeant's business practices began slowly emerging in the third quarter of 2015, Valeant's stock has plummeted more than 90%, from an artificially inflated high of $262 per share on August 5, 2015, to less than $25 per share on June 7, 2016, and the Company has lost more than *$80 billion* in market capitalization.   Since then, Valeant's stock has yet to recover, trading around $25 per share as of the filing of this complaint.

## INSIDER SALES BY DEFENDANT UBBEN

241.   Rather than providing the market with correct information, defendant Ubben used his knowledge about Valeant's true business health to sell his Valeant holdings while the Company's stock price was artificially inflated.   Doing so was unlawful and a violation of the fiduciary duties he owed to Valeant and its stockholders.

242.   While in possession of material, nonpublic information about Valeant's improper business practices and the impending decline in the Company's stock, defendant Ubben sold 4.2 million shares of his Valeant stock, in one day, over five tranches, at $219 and $230.60 per share (an average of $220.24 per share), for unlawful proceeds of $925 million.[17]   The timing and scope of defendant Ubben's trades are suspicious.   Defendant Ubben purchased the shares at an average price of

---

[17] These shares are directly beneficially owned by ValueAct Capital Master Fund, L.P. or ValueAct Co-Invest Master Fund, L.P.

$11, held the shares for nine years, had not previously sold Valeant stock in more than four years, and timed the sale to maximize profit from Valeant's then artificially inflated stock price, which was trading at or near all-time highs of around $229 per share.  Approximately 95% of the $925 million in illicit trading proceeds was profit for defendant Ubben.  Defendant Ubben's sales are also suspicious given that his stock sales represented 21.67% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 17,559,302 |
|---|---|
| Shares Sold During Sales Period ("SP")[18] | 4,200,000 |
| Shares Disposed (Other) During SP | 189,616 |
| Total Shares Held During SP | 19,383,877 |
| Shares Remaining SP | 14,994,261 |
| **Total Proceeds from Sales** | **$925,011,613.20** |
| **% of Total Ownership Sold During SP** | **21.67%** |

Further, since his sales on June 10, 2015, defendant Ubben has not sold a single share of Valeant stock.

243.   On June 30, 2019, Judge Shipp denied defendant Ubben's motion to dismiss claims in the Securities Class Action that he and his company ValueAct illegally dumped $925 million worth of Valeant stock ahead of revelations about the Company's deceptive sales practices.  In doing so, Judge Shipp noted that "the fact that Defendants did not sell [all] their shares does not render Plaintiffs' scienter allegations insufficient.  There is a plausible inference that Defendants' holdings of Valeant stock—approximately 15 million shares after the June 2015 Transaction—

---

[18] The sales period refers to the period between January 4, 2013 and March 15, 2016.

was so large that Defendants were unable to continue selling their shares without being caught." Judge Shipp continued: "This theory would explain why, despite Defendants knowing that Philidor was a 'house of cards,' Defendants did not sell more Valeant stock—Defendants could not sell without arousing suspicions in other quarters." Judge Shipp also found that the timing of the sales was suspicious because ValueAct only purchased—rather than sold—Valeant stock in the two years before June 2015.

## DAMAGES TO VALEANT

244. As a result of the Individual Defendants' improprieties, Valeant disseminated improper, public statements concerning its financial condition, revenue growth, compliance with GAAP, and affiliation with Philidor. These improper statements have devastated Valeant's credibility as reflected by the Company's more than $80 billion, or 90%, market capitalization loss.

245. Valeant's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Valeant's current and potential customers consider a company's ability to curb known abuses and implement adequate internal controls to ensure illegal practices are timely discovered and properly addressed. Businesses are less likely to award contracts to companies that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to

timely disclose material information.  Valeant's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

246.   Further, as a direct and proximate result of the Individual Defendants' actions, Valeant has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement or adverse judgment in the Securities Class Action and related litigation pending in New Jersey and Canada;

(b)    costs incurred from defending and paying any settlement or adverse judgment in the third-party payor litigation pending in New Jersey;

(c)    the $1.87 million Valeant paid to the California Department of Insurance to settle allegations it failed to prevent Philidor from submitting fraudulent claims for reimbursements of Valeant products;

(d)    costs incurred from restating and revising financial statements;

(e)    costs incurred in complying with the governmental investigations into the misconduct detailed herein, including any fines or penalties resulting therefrom;

(f)    costs incurred from the Company's internal investigation and review of its accounting violations; and

(g)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Valeant.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

247.   Plaintiffs bring this action derivatively in the right and for the benefit of Valeant to redress injuries suffered, and to be suffered, by Valeant as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution and indemnification, as well as the aiding and abetting thereof, by the Individual Defendants.  Valeant is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

248.   Plaintiffs will adequately and fairly represent the interests of Valeant in enforcing and prosecuting its rights.

249.   Plaintiffs were stockholders of Valeant at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Valeant stockholders.

250.   Boards of directors have an affirmative duty to conduct a reasonable, objective, and good faith investigation into the allegations in a stockholder litigation demand, and to determine on the basis of that investigation whether the demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the company's best interests.   Boards that fulfill their duty to investigate a stockholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith.   Boards that fail to do so may not avail themselves of this presumption, and the stockholder's litigation demand will be deemed to have been wrongfully refused.

251.   On June 5, 2018, plaintiffs' counsel sent the Shabbouei Demand to the Board, demanding the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging Valeant, including certain of the Company's current and former officers and directors.[19]   In a letter dated July 9, 2018, John L. Latham ("Latham") from the law firm of Alston & Bird LLP, stated that the Board had created the Special Committee to investigate the Shabbouei Demand, and that his firm was retained to

---

[19] A true and correct copy of the Shabbouei Demand is attached hereto as Exhibit A.

assist the Special Committee.  On July 30, 2018, plaintiffs' counsel sent the Wessels Demand to the Board, which is substantially similar to the Shabbouei Demand.[20]

252.   Having received scant information concerning the Special Committee and its ongoing investigation, in an August 3, 2018 letter, plaintiffs' counsel requested an update on the status of the investigation.[21]   Plaintiffs' counsel also detailed additional facts supporting his concerns that the fiduciaries of Valeant breached their fiduciaries duties.  In particular, plaintiffs' letter explained that in July 2018, Judge Shipp denied, in part, the Company's motions to dismiss in three separate lawsuits alleging Valeant inflated its stock price through unsavory and deceptive business practices.  The letter explained that, in doing so, Judge Shipp found that the investors adequately pled that Valeant and its executives engaged in a pattern of racketeering activity by using its clandestine pharmacy network and inaccurate financial statements to defraud investors.  Plaintiffs noted that these rulings are consistent with and bolster the allegations of wrongdoing detailed in plaintiffs' Demands.   Plaintiffs urged the Board to take this into account in considering their Demands.

---

[20] A true and correct copy of the Wessels Demand is attached hereto as Exhibit B.

[21] A true and correct copy of the August 3, 2018 letter is attached hereto as Exhibit C.

253.   At least four months after plaintiffs first sent their Demands, on or about November 29, 2018, counsel for the Special Committee notified plaintiffs' counsel by telephone that the Board had rejected the Demands.  Valeant did not provide any documentary evidence that the Board had rejected the Demands.

254.   At the time it informed plaintiffs that the Board rejected the Demands, counsel for the Special Committee stated that the Company and the Board were willing to provide certain of Valeant's internal books and records regarding the consideration of the Demands, subject to the parties entering into a confidentiality agreement.   Over the course of four months, counsel for the Special Committee dragged out the terms of the confidentiality agreement.    Counsel for the Special Committee repeatedly and at the last minute submitted additional edits to plaintiffs just as the parties were about to reach an agreement.

255.   On November 29, 2018, Robert R. Long ("Long") from the law firm of Alston & Bird LLP sent plaintiffs' counsel a proposed draft confidentiality agreement.   Plaintiffs' counsel responded on December 9, 2018, e-mailing a redline of their proposed edits to Long and Latham.[22]

256.   On December 11, 2018, Long e-mailed plaintiffs' counsel to set up a call to discuss plaintiffs' counsel's proposed edits.  On December 13, 2018, plaintiffs'

---

[22] A true and correct copy of this e-mail exchange is attached hereto as Exhibit D.

counsel and Long spoke telephonically regarding plaintiffs' counsel's proposed edits to the confidentiality agreement.

257.   Following this conversation, on December 17, 2018, Long e-mailed plaintiffs' counsel proposed revisions to the draft confidentiality agreement. Plaintiffs' counsel responded that same day, agreeing to all of counsel's proposed modifications except one.  The following day Long e-mailed plaintiffs' counsel to propose additional modifications to the draft confidentiality agreement.  Later that day, counsel for plaintiffs agreed to Valeant's supposed edits to the confidentiality agreement and asked whether it was ready for client execution.   Three weeks later, on January 2, 2019, the Special Committee's counsel stated that the Company now had a new series of edits to the confidentiality agreement.[23]

258.   Once again, the parties negotiated over the confidentiality agreement and it appeared that a compromise was reached.  However, on February 9, 2019, Valeant stated it had yet another edit to the already agreed upon confidentiality agreement.  On February 11, 2019, plaintiffs' counsel agreed to Valeant's "additional edit" to the confidentiality agreement.[24]

_____

[23] A true and correct copy of this e-mail exchange is attached hereto as Exhibit E.

[24] A true and correct copy of this e-mail exchange is attached hereto as Exhibit F.

259.  On February 22, 2019, plaintiffs sent their executed confidentiality agreement to the Company.  After not hearing back from Valeant, on March 1, 2019, plaintiffs asked the Special Committee's counsel when they would receive the documents concerning the Board's decision to reject the Demands.  On March 4, 2019, counsel for the Special Committee stated that he checked with Valeant and would "report back as soon as [he] heard something."[25]   Valeant never responded, never provided any of the books and records, and the Board never formally denied the Demands.

260.  The Board's action in offering and then ignoring its obligation to provide an actual response to the Demands and the reasons for its decision demonstrates it is acting in bad faith, and its rejection of the Demands, if indeed it has been rejected, was not done in good faith.  Further, it is apparent that the Board and Valeant will not respond to plaintiffs without Court action.  Accordingly, the Board wrongfully refused the Demands.

261.  Plaintiffs have not made any demands on the other stockholders of Valeant to institute this action since such demands would be a futile and useless act for at least the following reasons:

---

[25] A true and correct copy of this e-mail exchange is attached hereto as Exhibit G.

(a)     Valeant is a publicly held company with over 325 million shares outstanding and thousands of stockholders as of August 1, 2019;

(b)     making demands on such a number of stockholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demands on all stockholders would force plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

262.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

263.   The Individual Defendants owed and owe Valeant fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Valeant the highest obligation of good faith, fair dealing, loyalty, and due care.

264.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness and improper "tone at the top" within Valeant, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

265.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years, Valeant engaged in a number of unlawful and deceptive business practices that inflated its reported financial metrics; (ii) Valeant engaged in fictitious accounting practices and improperly recognized revenue in violation of GAAP; (iii) the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, Valeant's representations concerning its financial condition, business prospects, and financial controls were improper.   Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

266.   The Director Defendants, as directors of the Company, owed Valeant the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper conduct detailed herein.   The Director Defendants knew or were reckless in not knowing that: (i) for years, Valeant engaged in a number of unlawful and deceptive business practices that inflated its reported financial metrics; (ii) Valeant engaged in fictitious accounting practices and improperly recognized revenue in violation of GAAP; (iii) the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, Valeant's representations concerning its financial condition, business prospects, and financial

controls were improper.   Accordingly, these defendants breached their duty of loyalty to the Company.

267.   The Audit and Risk Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit and Risk Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit and Risk Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Risk Committee Charter in effect at the time.

268.   Defendant Ubben breached his duty of loyalty by selling Valeant stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.   The information described above was material, nonpublic information concerning the Company's future business prospects.   It was a proprietary asset belonging to the Company, which defendant Ubben used for his own benefit when he sold Valeant common stock.

269.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Valeant has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

270.   Plaintiffs, on behalf of Valeant, have no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Waste of Corporate Assets**

271.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

272.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action and related litigation that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revising its past financial statements.

273.   Finally, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Valeant to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

274.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

275.   Plaintiffs, on behalf of Valeant, have no adequate remedy at law.

## **COUNT III**

### **Against the Individual Defendants for Unjust Enrichment**

276.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

277.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Valeant.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Valeant.

278.   Defendant Ubben sold Valeant stock while in possession of material, nonpublic information that artificially inflated the price of Valeant stock.  As a result, defendant Ubben profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

279.   Plaintiffs, as stockholders and representatives of Valeant, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

280.   Plaintiffs, on behalf of Valeant, have no adequate remedy at law.

## COUNT IV

**Derivatively for Contribution and Indemnification Under §§10(b) and 21D of the Exchange Act Against the Securities Class Action Defendants**

281.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

282.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Pearson, Schiller, Rosiello, Jorn, Carro, Kellen, Power, Ingram, Melas-Kyriazi, Provencio, Stevenson, Ubben, Farmer, and Goggins (the "Securities Class Action Defendants"), each of whom are named as defendants in the Securities Class Action.

283.   Valeant is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of section 10(b) of the Exchange Act.   If Valeant is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the Securities Class Action Defendants as alleged herein.   The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

284.   As directors and officers of Valeant, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the

content of public statements about Valeant, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

285.   The Securities Class Action Defendants are also liable under section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

286.   Accordingly, Valeant is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing Valeant to liability under the federal securities laws.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Valeant, demand judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and contribution and indemnification;

B.     Directing Valeant to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and

to protect Valeant and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen Board oversight and supervision of Valeant's business and pricing practices;

2.      a proposal to strengthen Board oversight of the Company's acquisition targets;

3.      a proposal to strengthen the Company's controls over accounting and financial reporting;

4.      a proposal to strengthen Valeant's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

6.      a provision to control insider selling and conflicts of interest;

7.      a provision to permit the stockholders of Valeant to nominate at least three candidates for election to the Board;

8.      a proposal to appoint additional independent board members with established reputations in the pharmaceutical industry and with substantial experience in governance, risk and compliance issues;

9.      a proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

10.     a proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

11.     a proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

12.     a proposal to review and implement policies and procedures for escalating internal and regulatory issues internally and to the Board;

13.     a proposal to review and implement the confidential reporting structure and investigative process of complaints within the company; and

14.     a proposal to enhance security and cybersecurity around data privacy, patient information, and system security;

- 147 -

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Valeant have an effective remedy;

D.      Awarding to Valeant restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Dated: March 7, 2020                    HERMAN JONES LLP

                                        s/ *Serina M. Vash*
                                        SERINA M. VASH (N.J. Bar. No. 041142009)

                                        HERMAN JONES LLP
                                        SERINA M. VASH
                                        153 Central Avenue #131
                                        Westfield, New Jersey 07090
                                        svash@hermanjones.com
                                        Telephone: (404) 504-6516
                                        Facsimile: (404) 504-6501

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH (*pro hac vice*)
STEVEN R. WEDEKING (*pro hac vice*)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiffs

1419998